AO 91 (Rev. 11/11) Criminal Complaint

AUSA Timothy J. Storino (312) 353-5347
AUSA William Dunne (312) 353-2815

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED
FEB 23 2016
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

GABRIEL ROSAS,
aka "Gabe"

CASE NUMBER: 16 CR 107
UNDER SEAL

MAGISTRATE JUDGE GILBERT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about March 18, 2015, at Joliet, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 922(g)(1) | Knowingly and intentionally possessed in and affecting interstate commerce a firearm, namely, a .22 caliber Phoenix Arms pistol, Model HP22A, bearing serial number 4406046, and a Rohm .22 caliber revolver, bearing serial number 1047115, after previously having been convicted of a crime punishable by a term of imprisonment exceeding one year. |
| Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) | Knowingly and intentionally distributing a mixture or substance containing a detectable amount of cocaine. |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

_____
JOSEPH DYNES
Special Agent, ATF

Sworn to before me and signed in my presence.

Date: February 23, 2016

_____
Judge's signature

City and state: Chicago, Illinois

JEFFREY T. GILBERT, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS  ss

## AFFIDAVIT

I, JOSEPH DYNES, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives, and have been so employed since October 2014. My current responsibilities include the investigation of firearms trafficking, illegal firearms possession, and narcotics trafficking.

2. This affidavit is submitted in support of a criminal complaint alleging that Gabriel ROSAS, also known as "Gabe," has violated Title 18, United States Code, Section 922(g)(1) and Title 21, United States Code, Section 841(a)(1) and (b)(1)(C). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging ROSAS with possession of a firearm by a convicted felon, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, experience and training, information provided to me by other law enforcement agents and the experience and training of those agents, numerous interviews of a confidential source, review of consensual recordings, and physical surveillance.

4. At various points in this Affidavit, I will offer my interpretation of certain recorded conversations and meetings in brackets or immediately following a quotation. My interpretation of these conversations is based on my knowledge of the investigation to date, the content and context of the conversations as well as prior and subsequent conversations, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations. The summaries of conversations included in this Affidavit do not include all statements or topics covered during the course of the recorded conversations. In addition, the conversations are based on draft, not final, transcripts of the conversations. Times, where provided, are approximate.

5. Based on the information contained in this Affidavit, I submit that there is probable cause to believe that, on or about March 18, 2015, Gabriel ROSAS, aka, "Gabe," (1) having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, knowingly possessed a firearm, in and affecting interstate commerce, in that the firearm had traveled in interstate commerce prior to the defendant's possession of the firearm, namely a .22 caliber Phoenix Arms pistol, Model HP22A, bearing serial number 4406046 and a Rohm .22 caliber revolver, bearing serial number 1047115, in violation of Title 18, United States Code, Section 922(g)(1); and (2) knowingly and intentionally distributed a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

## FACTS IN SUPPORT OF PROBABLE CAUSE

*Introduction and Background*

6. Since July 2014, ATF has been investigating a faction of the Latin Kings street gang based in Joliet, Illinois (the "Joliet Latin Kings"). In the course of that investigation, law enforcement has employed a variety of law enforcement tactics and tools, including the use of a confidential source (hereinafter "CS"), the consensual recording of telephone calls with Joliet Latin Kings gang members, the consensual recording of in-person meetings of the Joliet Latin Kings, and the purchase of illegal narcotics and firearms by the CS from various Joliet Latin Kings gang members.

7. As noted above, this investigation has employed the use of a CS. The CS is a member of the Joliet Latin Kings who has been cooperating with the ATF in relation to this investigation since in or around April 2014, after agents approached the CS and advised the CS that they suspected that he/she was engaged in narcotics trafficking. The CS agreed to cooperate with federal law enforcement. The CS is cooperating in hopes that he/she will not be charged for these offenses, and, beginning in or around April 2014, the CS has been paid for his/her cooperation in the instant investigation. To date, the CS has been paid approximately $21,000 for his/her cooperation in relation to the instant gang investigation. The CS has also been paid for his/her cooperation in two other investigations in the amount of approximately $1,000. The CS has arrests for weapons offenses, traffic offenses, public peace/disorderly conduct, criminal damage to property, and dangerous drugs,

as well as convictions for narcotics possession and unlawful possession of a weapon. Neither the ATF nor the United States Attorney's Office has made any promises to the CS in exchange for his/her cooperation.

8. The information contained herein that was obtained from the CS has been corroborated and crosschecked, where possible, by investigation and law enforcement computer systems and documents. This affiant and other law enforcement officers have taken part in the interview process and analysis of the information provided by the CS and have found the CS's information to be truthful and reliable. In addition, the CS has been corroborated extensively by controlled undercover activities with other gang members through the use of electronic surveillance techniques, including both video and audio recordings of the undercover meetings and contraband transactions.

9. ROSAS is 39 years old and a convicted felon. According to the CS as well as information gathered from the instant investigation, ROSAS is a current member of the Joliet faction of the Latin Kings. As set detailed below, during this investigation, the CS purchased three firearms from ROSAS during two controlled transactions, which occurred on December 31, 2014, and on March 18, 2015.

*December 31, 2014, sale of a firearm by ROSAS to the CS*

10. On or about December 20, 2014, the CS advised agents that the CS unexpectedly ran into ROSAS and he told the CS in an unrecorded conversation that he (ROSAS) had three 9mm firearms for sale. On or about December 21, 2014, at the direction of agents, the CS sent a text message to ROSAS at a telephone

number ending in 0956,[1] which stated: "it's me [the CS]. .. was checking about those things [firearms] we talked about... I'm on it brother.." About one minute later, ROSAS responded, "K."

11. On or about December 30, 2014, the CS met ROSAS in an unplanned meeting, at which ROSAS told the CS in an unrecorded conversation that he (ROSAS) still had a 9mm firearm for sale for $400. The CS agreed to buy the firearm the next day.

12. On or about December 31, 2014, at approximately 10:30 a.m., the CS sent a text message to ROSAS at a telephone number ending in 0956, which read: "Yeah 4sure at 5 I got to visit with my grandma after that so if we can do it sooner that will be cool too ... I got the loot..." Later that afternoon during a recorded telephone call between the CS and ROSAS at a telephone number ending in 0956, ROSAS stated he was "waiting on my dude [source] to get out of work." ROSAS instructed the CS to wait until ROSAS called the CS. Approximately an hour and half later, the CS called ROSAS at a telephone number ending in 0956. During that recorded call, the CS stated, "what's the business," and ROSAS responded that the CS could come over "through and chill" and "he'll [source of firearm] be here,"

---

[1] This telephone number has been identified as being used by ROSAS based on law enforcement's review of the recorded telephone calls made from this number, which law enforcement has determined the voice of the person who spoke with the CS during those calls matched the voice of additional recorded calls between ROSAS and the CS as well as recorded meetings between ROSAS and the CS. In addition, as reflected in this affidavit, ROSAS appeared for the two meetings with the CS consistent with the messages being sent over the 0956 number.

meaning the CS could come to where ROSAS was and wait for the source to bring the firearm.

13. At approximately 4:45 p.m., the CS met with agents at a predetermined meeting location, where they searched the CS and the CS's vehicle, equipped the CS's person with an audio-video recording device, and provided the CS with $400 in pre-recorded United States currency. Agents then surveilled the CS as he/she drove to ROSAS's residence on Elgin Avenue in Joliet, Illinois, and, upon arriving there at approximately 5:07 p.m., agents observed as the CS walked to the rear of the residence.

14. As reflected on the audio-video recording device and according to the CS, inside the basement apartment was ROSAS and two other Hispanic males smoking marijuana. As reflected on the video-audio recording, the CS sat down in a chair and waited for ROSAS's source to arrive.

15. At approximately 5:16 p.m., agents observed a white car arrive at ROSAS's residence. According to the CS, about the same time, an Hispanic male entered the basement apartment and handed a nylon lunch bag to ROSAS and stated words to the effect of whether they were going to "step out," meaning go into another room to complete the transaction. As reflected on the video-recording, ROSAS and the CS then stood up and walked to another room. Shortly thereafter, the audio-video recording then captured the sound of a Velcro bag being opened, and according to the CS, ROSAS showed the CS the 9mm firearm. The CS stated words to the effect of, "that mother fucker's decent," referring to the firearm, and

ROSAS agreed. According to the CS, ROSAS then showed him/her a box of 9mm ammunition, but told the CS that he could not give the box to him/her. According to the CS, ROSAS then found a sock and poured the ammunition into the sock, which ROSAS gave to the CS. As reflected on the audio-video recording, the CS counted out $400, which, according to the CS, he/she handed to ROSAS. ROSAS advised the CS "to be careful out there."

16. At approximately 5:19 p.m., agents observed the CS walk from the rear of ROSAS's residence, enter his/her car, and drive to a predetermined meeting location. There, the CS gave agents a dark-colored lunch bag. Inside the bag, agents seized a 9mm, Bryco Arms, Model – Jennings Nine, bearing serial number 136207, wrapped in a green washcloth, and a sock containing 50 rounds of 9mm ammunition. Agents search the CS and the CS's vehicle for an additional contraband, with negative results.

*March 18, 2015, sale of two firearms by ROSAS to the CS*

17. On or about March 16, 2015, CS reported to ATF that, on a prior occasion, the CS ran into ROSAS unexpectedly in the Joliet area and ROSAS indicated to the CS that he had firearms for sale.

18. On or about March 17, 2015, the CS and ROSAS exchanged calls/text messages in an attempt to negotiate the purchase of the firearms.[2] At approximately 7:33 p.m. that day, the CS sent a text message to ROSAS, stating,

---

[2] These calls/text messages were not recorded because ROSAS contacted the CS on a telephone different than the one provided by law enforcement to the CS to be used in relation to the instant investigation.

7

"Hey it's [the CS], this is my other line – gonna call in a min." ROSAS responded, "K."

19. At approximately 7:41 p.m., the CS, at the direction of ATF, placed a consensually-recorded telephone call to ROSAS at a telephone number ending in 9398.[3] The CS asked if they could "do that tomorrow as soon as I can get back," referring to the CS purchasing the firearms. ROSAS stated, "Yeah we can do that tomorrow, cause I have to have somebody bring them [the firearms] to me." ROSAS asked the CS what time tomorrow, so ROSAS could "make sure I got everything on, right there," referring to having the firearms at his residence ready for sale. The CS and ROSAS agreed to conduct the transaction between 6:00 p.m. and 8:00 p.m. the following day, that is, March 18, 2015. The CS asked: "So they're both the same thing," meaning whether both firearms were the same caliber. ROSAS confirmed, "Yeah, they're both the same thing. The one with the three, that's a, it's a 22 long. Just a [unintelligible] it got three of those things with it, and then the other one is a, a revolver." The CS understood ROSAS to mean that both firearms were .22 calibers, while one .22 caliber had three magazines with it and the other .22 caliber was a revolver. The CS then asked, "All together, like what 650 for both [$650 for

---

[3] This telephone number has been identified as belonging to ROSAS based on law enforcement's review of the recorded telephone calls made from this number, including the March 17, 2015 call referenced above, which law enforcement has determined the voice of the person who spoke with the CS during those calls matched the voice of additional recorded calls between ROSAS and the CS as well as recorded meetings between ROSAS and the CS. In addition, and subsequent to the March 17, 2015 call as well as other recorded calls, the CS met with a person who law enforcement subsequently identified as ROSAS. Unless otherwise noted, all recorded calls and text messages between the CS and ROSAS were from this phone number ending in 9398.

both firearms]?" ROSAS agreed, and asked if the transaction was "a for sure thing, so I can have 'em ready." The CS responded it will be "a for sure thing." The CS and ROSAS agreed to conduct the transaction on March 18, 2015.

20.     On March 18, 2015, the CS informed agents that, earlier that day, the CS spoke to ROSAS and ROSAS confirmed the transaction would occur later that evening. The CS also asked ROSAS if the CS could purchase a "zone," referring to an ounce of cocaine from ROSAS. ROSAS stated that would be okay. This call was not recorded.[4]

21.     At approximately 4:46 p.m. that day, the CS placed a consensually-recorded telephone call to ROSAS. The CS stated that he/she was about two hours away and asked, "Everything is still all good, right?" ROSAS replied "Yeah." The CS asked ROSAS if he would "have that other thing ready for me too," referring to the ounce of cocaine. ROSAS replied "Yep." ROSAS asked what time the CS would be around to do conduct the transaction. The CS responded: "About 8 o'clock," and then clarified between 7:30 and 8:00 p.m.

22.     At approximately 8:15 p.m., the CS met with agents at a predetermined meeting location.

23.     At approximately 8:30 p.m., in the presence of agents the CS called ROSAS, who asked the CS, "You ready?" The CS stated he/she was "getting the money together now" and asked how much "you want for that one thing [the ounce of cocaine]?" ROSAS responded: "I got both of them on deck right now for the 650

---

[4] This call was not recorded because, at the time of the conversation, the CS was working.

9

[$650 for the two firearms]." The CS clarified, "No, I'm talking about the other one [the ounce of cocaine]." ROSAS stated "Which one?" The CS replied, "The zone [the ounce of cocaine]." ROSAS stated "Oh, for the seven [$700]." The CS asked ROSAS if the CS "grabbed the zone, do you think you could a, knock fifty bucks off the other one, an even six?," referring to ROSAS taking $50 dollars off the price of the firearms if the CS also purchased the ounce of cocaine for $700. ROSAS replied, "Just come holler at me." The CS stated that he/she would be over in approximately 10 minutes.

24. After the consensually-recorded telephone call with ROSAS, the agents searched the CS and the CS's vehicle for contraband, with negative results. The agents gave $1,300 to the CS in pre-recorded United States currency. The agents equipped the CS's person with audio-video recording equipment, and surveilled the CS as he/she drove to ROSAS's residence on Elgin Avenue in Joliet, Illinois.

25. At approximately 8:45 p.m., agents observed the CS arrive at ROSAS's residence, park, exit his/her vehicle and walk to the rear of the residence towards the basement apartment.

26. As captured on the video-recording and according to the CS, inside the basement apartment was ROSAS and three other subjects.[5] According to the CS,

---

[5] The identification of ROSAS in this Affidavit is based on the following: (1) the CS's identification of ROSAS as the person who sold a firearm and cocaine to him/her on or about March 18, 2015; (2) law enforcement's review of the March 18, 2015, video-recording which captured the face of the person who met with the CS in the basement apartment at 1105 Elgin Avenue, Joliet, Illinois, which matches the appearance of a known photograph of ROSAS, and also matches past physical surveillance and video-recorded meetings with ROSAS in the same investigation, including the purchase of a firearm from ROSAS by the CS on or about December 31, 2014, at the same residence; and (3) law enforcement's review

there was a large chunk of suspect cocaine on the table inside the apartment. The CS told ROSAS that the CS was trying to "grab that [firearm] right quick, cause they just, they just lit this nigger's crib up," referring to why the CS needed the firearm quickly and the CS's purported plan to give the firearm to fellow Latin King gang member Individual A, whose residence was shot at in a drive-by shooting by Vice Lord gang members. ROSAS asked the CS who did the shooting, and the CS replied, "them Hooks [Vice Lords street gang]," a rival of the Latin Kings, according to the CS. The CS told ROSAS, "That shit's going down. It's like a war zone," referring to the ongoing battle between the Latin Kings and Vice Lords. According to the CS, ROSAS then showed the CS a nylon case containing two extra magazines for the semi-automatic firearm. According to the CS, ROSAS removed the two firearms from two socks. The CS told ROSAS that he/she was going to "run this down and then I'll, I'll shoot [come] back," referring to giving the firearms to Latin King gang members to be used in retaliation for the drive-by shooting. According to the CS, ROSAS showed the firearms to the CS, and the CS stated, "Those [firearms] are small." ROSAS stated, "Yeah, this is a short [referring to the revolver], this one's a long [referring to the semi-automatic firearm but the firearm itself stated .22 long rifle on it]." The CS asked ROSAS if he would take "13 [$1,300] for everything [the two firearms and the ounce of cocaine]." ROSAS asked "and a zone

---

of the March 18, 2015, audio-recording which captured the voice of the person who met with the CS in the basement apartment at 1105 Elgin Avenue, Joliet, Illinois, which matches the voice of past recorded calls between ROSAS and recorded meetings between ROSAS and the CS, including the purchase of a firearm from ROSAS by the CS on or about December 31, 2014.

11

[ounce of cocaine]?" The CS clarified: "Seven [$700] for the zone [ounce of cocaine] and six [$600] for both the things [two firearms]." ROSAS agreed: "Yeah, fuck it." According to the CS, ROSAS then went to the table and placed some cocaine into a plastic bag; ROSAS weighed the cocaine and then handed it to the CS. The CS told ROSAS that the CS was going to drop the guns off in the "neighborhood" and "because they they really need it," referring to the Latin Kings needing the guns to use against the Vice Lords. The CS asked ROSAS, "They're not loaded, right?" ROSAS replied, "The automatic is, automatic got the clip in it already." The CS then handed ROSAS $1,300 in pre-recorded United States currency, and as the CS did so, the CS stated, "That's thirteen [$1,300]." The CS asked for a bag to put the two firearms and the ounce of cocaine into. ROSAS gave the CS a paper shopping bag, and the CS placed all the items in the shopping bag and exited the apartment.

27. At approximately 8:52 p.m., surveillance agents observed the CS walk from the rear of ROSAS's residence and enter the CS's vehicle. Law enforcement conducted surveillance as the CS drove to the predetermined meeting location.

28. At approximately 8:59 p.m., law enforcement met the CS at the predetermined meeting location. Agents recovered a shopping bag from the floorboard of the CS's vehicle; inside the bag was two firearms, specifically: (1) a Phoenix Arms pistol, model HP22A, .22 caliber, bearing serial number 4406046, loaded with 10 rounds of .22 caliber ammunition, wrapped in a black sock; and (2) a Rohm .22 caliber revolver, bearing serial number 1047115, wrapped in a white and pink sock. Also recovered from the bag was (1) a nylon dual-magazine pouch with

two .22 caliber magazines with 9 and 10 rounds of .22 caliber ammunition in each magazine, respectively; (2) five rounds of .22 caliber ammunition in the same white and pink sock that contained the Rohm revolver; and (3) a small plastic bag containing approximately 29 grams of a white chunky substance, which field tested positive as cocaine. The agents subsequently searched the CS and the CS's vehicle for additional contraband, with negative results.

*Interstate Nexus of Firearm*

29.     On or about October 5, 2015, an ATF firearms interstate nexus expert examined the description of each firearm purchased by the CS from ROSAS on or about March 18, 2015, and determined that neither firearm was manufactured in the State of Illinois, and both firearms therefore had travelled in interstate commerce prior to ROSAS's possession of them.

*ROSAS's Criminal History*

30.     According to certified copies of conviction provided by the Clerk of the Circuit Court of Will County, Illinois, as well as the Clerk of the Circuit Court of LaSalle County, Illinois, ROSAS had been convicted of the following felony offenses prior to March 18, 2015, all of which were punishable by a term of imprisonment exceeding one year: (1) on or about September 18, 1995, ROSAS was convicted of aggravated discharge of a firearm, and sentenced to 4 years' imprisonment (Will County); (2) on or about February 21, 1997, ROSAS was convicted of possession of contraband in a penal institution and sentenced to 2 years' imprisonment (LaSalle County); (3) on or about November 24, 1998, ROSAS was convicted of conspiracy to

commit first degree murder, and sentenced to 10 years' imprisonment (Will County); (4) on or about June 13, 2007, ROSAS was convicted of unlawful possession of a controlled substance with intent to deliver, and sentenced to 9 years' imprisonment (Will County); and (5) on or about on or about June 18, 2007, ROSAS was convicted of aggravated battery, and sentenced to 2 years' imprisonment, to run concurrent to the sentence imposed on June 13, 2007 (Will County).

## CONCLUSION

31. Based on the foregoing, I believe there is probable cause to believe that, on or about March 18, 2015, Gabriel ROSAS, aka, "Gabe," having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, knowingly possessed a firearm, in and affecting interstate commerce, in that the firearm had traveled in interstate commerce prior to the defendant's possession of the firearm, namely a .22 caliber Phoenix Arms pistol, Model HP22A, bearing serial number 4406046, and a Rohm .22 caliber revolver, bearing serial number 1047115, in violation of Title 18, United States Code, Section 922(g)(1); and (2) knowingly and

intentionally distributed a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

FURTHER AFFIANT SAYETH NOT.

_____
JOSEPH DYNES
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SUBSCRIBED AND SWORN to before me on February 23, 2016.

_____
JEFFREY T. GILBERT
United States Magistrate Judge

15