1  **TRANSCRIBED FROM DIGITAL RECORDING**

2                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
3                        EASTERN DIVISION

4  UNITED STATES OF AMERICA,              )
                                          )
5                Plaintiff,               )
                                          )
6                vs.                      )  No. 16 CR 107-1
                                          )
7  GABRIEL ROSAS, also known as Gabe,     )  Chicago, Illinois
                                          )  March 11, 2016
8                Defendant.               )  2:08 P.M.

9      TRANSCRIPT OF PROCEEDINGS - Detention Hearing (Continued)
         BEFORE THE HONORABLE JEFFREY T. GILBERT, Magistrate Judge
10
   APPEARANCES:
11
   For the Government:        HON. ZACHARY FARDON
12                            219 South Dearborn Street
                              Chicago, Illinois  60604
13                            BY:  MR. TIMOTHY JOSEPH STORINO
                                   MR. WILLIAM DUNNE
14
   For the Defendant:         RASCIA & HIMEL, LTD.
15                            650 North Dearborn Street
                              Suite 700
16                            Chicago, Illinois  60654
                              BY:  MR. ROBERT LOUIS RASCIA
17

18 ALSO PRESENT:              Mr. Matthew Bonestroo
                              Pretrial Services
19

20                    PAMELA S. WARREN, CSR, RPR
                         Official Court Reporter
21                      219 South Dearborn Street
                              Room 2342
22                      Chicago, Illinois   60604
                           (312) 408-5100
23
   **NOTE:  Please notify of correct speaker identification.**
24 **FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS**
   **UNINTELLIGIBLE.**
25

1          (Proceedings held in open court:)

2          THE CLERK:  16 CR 107, United States versus of America

3    versus Rosas, for continued detention hearing.

4          MR. STORINO:  Good afternoon, your Honor.  Timothy

5    Storino and William Dunne on behalf of the United States.

6          THE COURT:  Good afternoon.

7          MR. RASCIA:  Good afternoon, your Honor.  Robert

8    Rascia for Mr. Rosas.  He's present.

9          THE COURT:  Good afternoon, Mr. Rascia.

10         And good afternoon, Mr. Rosas.  How did your

11   appointment go with Rush?  Did you get over there to look at

12   your shoulder?

13         THE DEFENDANT:  Finally.  (Unintelligible) not my

14   shoulder --

15         THE COURT:  Your spine?

16         THE DEFENDANT:  -- my spine.  Yeah, they looked at my

17   (unintelligible).  They did everything.  They did a PET scan.

18   (Unintelligible).

19         THE COURT:  Okay.  And you are in the wheelchair

20   because you cannot walk or because it is more comfortable for

21   you to be there --

22         THE DEFENDANT:  I am comfortable.  I am in a walker.

23         THE COURT:  Okay.

24         THE DEFENDANT:  That's what I (unintelligible) send me

25   in a walker because of my spine.

1          THE COURT:  Okay.  And we have Mr. Bonestroo from

2     pretrial services, right?

3          MR. BONESTROO:  Good afternoon, your Honor.

4          THE COURT:  Okay.  Where do we stand on this,

5     Mr. Rascia?

6          MR. RASCIA:  Judge, I received --

7          THE COURT:  Did everybody get PS, the -- didn't we get

8     a rather updated -- didn't we get an update from pretrial

9     services?

10          MR. STORINO:  We did, your Honor.

11          THE COURT:  It is actually sitting on my desk, Brenda.

12          THE CLERK:  I'll go get it, yeah.

13          THE COURT:  Yes.  You got it?

14          MR. RASCIA:  I did.

15          THE COURT:  Then the government got it?

16          MR. STORINO:  Yes, your Honor.

17          THE COURT:  Okay.

18          MR. RASCIA:  Judge, at about 12:30 or 12:45 this

19     afternoon, I received a telephone call from the record keepers

20     at Silver Cross Hospital.  The medical records that we

21     requested have been reproduced.  We had indicated to them that

22     we were willing to pick them up.  They told us what the balance

23     due was, and we intend to pick them up, except they didn't call

24     us until 12:30-ish, and I wouldn't be able to go out to Joliet

25     and get back here or, more importantly, I should review the

records.  Based on the fee we paid to get the records, I'm
expecting that they're reasonably voluminous.

Aside from that, Judge, the only new information since
we saw you last is the addendum that you have before you.

THE COURT:  Okay.  I mean, I know we're
waiting -- we're awaiting confirmation of the -- his medical --
Mr. Rosas's medical condition.  I mean, you guys -- and I would
like to know how you would like to proceed with the hearing
today.

But is there any doubt that -- in the government's
mind that Mr. Rosas has been -- and is -- do you have any
problem with my disclosing his medical condition on the record,
Mr. Rascia?

MR. RASCIA:  None whatsoever, Judge.

THE COURT:  I mean, the pretrial services record says,
he self-reports he's diagnosed with cancer.  Ms. -- Ms. Silerio
-- like is that who is here?

MR. RASCIA:  She's here, Judge.

THE COURT:  -- confirms that.  Do you guys have any
question as to whether or not Mr. Rosas has been diagnosed with
cancer?

MR. STORINO:  I wouldn't say questions, I wouldn't say
doubts, but I would say that having the records and learning
the extent and scope of his illness and whether or not he can
be treated by a facility like the MCC is really very important

to the Court's determination.

So our position would be, it sounds like the records are close at hand. We almost have them. We should obtain them, allow the parties and the Court to review them. I'm not saying that the government is going to see the records and say, well, let's let Mr. Rosas out. There are still very serious problems with letting him out, including undocumented travel to Mexico in the last year on three separate occasions --

THE COURT: Uh-huh.

MR. STORINO: -- as well as my understanding that he has a brother down in Mexico.

So I think the first step is to at least see the records, review them, and see if it furthers the ball, and then to convene again when the Court is available for a fuller bond hearing.

THE COURT: Okay. Well, as I think I said, maybe when Mr. Dunne was here, I am -- unfortunately I'm not available for another -- myself, I'm not available for another bond hearing until the last week of March because I'm going to be out of -- out of here, out of the country. That's not to say that there is not a duty judge who could have this hearing when and if you get those. And so I can make that person aware of these things for next week and the week after.

What can -- I mean, can you tell me if -- as long as you're not -- there is nothing secret on the record, what --

what is the nature of -- as you understand it Mr. Rosas's

diagnosis?

      MR. RASCIA:  Judge, it --

      THE COURT:  Or is that something you don't want to put

on the record?

      Or do you want to wait for the records too?  That's

fine too.

      MR. RASCIA:  Judge, he has testicular cancer that's

me- --

      THE COURT:  Metastasized.

      MR. RASCIA:  -- metastasized.  I always have trouble

with that word.

      THE COURT:  Uh-huh.

      MR. RASCIA:  And, Judge, you know, I have had lengthy

conversations with Mr. Rosas understanding the duty that he has

that if he provides information, it has to be truthful

information.  He certainly could provide no information and

remain silent if he chooses to do that.

      THE COURT:  Uh-huh.

      MR. RASCIA:  But this is a situation where he's told

pretrial about this condition.  He has authorized me to tell

you about the condition.  And now that he has said those things

both to pretrial and actually in court -- I'm not encouraging

the government to seek some additional punishment down the road

for Mr. Rosas -- but, you know, quite candidly I don't know why

someone would make those representations and then later on have

them proved to be false because the consequences -- for

example, if you decided to let him out today, and next week

when the government gets the records they find out it is not

true, I'm sure they would very quickly move to revoke

Mr. Rosas's bail.

          And then there could be additional consequences down

the road.  If he were convicted in the case, I'm sure the

government would likely seek an enhancement under the

guidelines for making a false statement to pretrial and to your

Honor during the detention hearing.  So I -- you know, I have

no reason to think that Mr. Rosas would fabricate what his

current medical condition is.

          Aside from that, Judge, I would note that -- you know,

I understand the government's concern that if Mr. Rosas has a

relative living in Mexico maybe that gives him some place to

abscond to.  This is a gentleman who has lived in the United

States his entire life.  He doesn't speak --

          THE COURT:  He was born here.  He is a U.S. Citizen.

          MR. RASCIA:  Right, he's a U.S. citizen.  He doesn't

speak Spanish.

          But, more importantly, I would note that, you know, if

the government wants to say, well, you know, he's possibly

looking at jail time -- well, at other times in his life he has

been out on bail and went to jail.  He didn't flee in those

cases. I don't -- I don't understand why all of a sudden he would consider doing something like that when he's never done it in the past. So I really don't think that that's a reasonable position.

Judge, any time someone is incarcerated prior to a conviction, I know your Honor knows that's a very serious step to take. Given all the circumstances of Mr. Rosas, I would ask that you consider releasing him to home confinement, to his girlfriend, who is here in court. She's willing to let him live at the house on home confinement on electronic monitoring.

I'll produce the records to the government very promptly. We're not going to go out there today because nobody is going to be able to make it out there before 4:00 o'clock, but we'll pick them up Monday, pay the appropriate fee for the records, turn over the records to the government. And if there is an issue, we could file -- they could file the appropriate motion.

I know your Honor has invested a significant amount of time with Mr. Rosas already, and I think it would be in Mr. Rosas's best interest to have you resolve this issue one way or the other. I respect that your schedule won't allow you to do that until the end of March. But if that's going to be the case, I would ask if you would consider his release. I -- it is recommended in the pretrial services report, and I think it would be appropriate in this case.

1          THE COURT:  Mr. Bonestroo, from pretrial services,

2     maybe you can come closer so they can hear you on the sound

3     system.

4          In your original report you said, after completion of

5     verification of the defendant's background information and

6     proposed residence, you respectfully recommend that he be

7     released on an unsecured bond, home incarceration, various

8     other conditions.

9          Have you now, with this supplemental report, gotten

10    the verification of his -- of Mr. Rosas's background that you

11    -- and proposed residence that you were talking about that you

12    wanted to get?

13         MR. BONESTROO:  We have, your Honor.

14         THE COURT:  Okay.  And so the fact that he has been

15    living at the residence of his sister -- I guess, it is a

16    different sister, Susan Rosas not Veronica Rosas.  That's of no

17    consequence, right?

18         MR. BONESTROO:  Not at this time.

19         THE COURT:  Okay.  So you're still -- your

20    recommendation remains as it is in the pretrial services report

21    that you tendered back on March 1st, right?

22         MR. BONESTROO:  It remains basically the same.  We

23    only added that he reside full time at a residence approved by

24    the Court, and that he may -- well, under home incarceration,

25    he would be allowed to leave for medical appointments

1    preapproved by our office.

2              THE COURT:  Uh-huh.

3              MR. BONESTROO:  Those were the only two additions from

4    the previous report.

5              THE COURT:  Oh, I didn't catch that.  Okay.  The last

6    two there.

7              MR. BONESTROO:  Correct.

8              THE COURT:  And the residence you would be

9    recommending is the residence that he's been at with

10   Ms. Silerio owned by his sister?

11             MR. BONESTROO:  Well, we would leave -- we would leave

12   that to the Court's discretion.  We have no opinion --

13             THE COURT:  You just want there to be a residence.

14             MR. BONESTROO:  Correct.  We just want to make sure

15   there is a residence for him to go to, and that that person is

16   comfortable with all the location monitoring requirements,

17   which --

18             THE COURT:  Uh-huh.

19             MR. BONESTROO:  -- she indicates she was.

20             THE COURT:  Okay.  Thanks.

21             MR. RASCIA:  And, Judge, she's here today.

22             THE COURT:  Right.  I see Ms. Silerio.  She waved to

23   me when you were --

24        (Brief interruption.)

25             THE COURT:  And you said you are going to get these

1  records on Monday, right?

2  　　　MR. RASCIA:  We'll go out there Monday morning.

3  Somebody from our office -- actually we have a case in the Will

4  County courthouse Monday morning, so whichever one of the three

5  of us is going to Will County, somebody will stop and pick up

6  the records.

7  　　　THE COURT:  You know, another option, because I have

8  devoted a lot of time with this -- to this with Mr. Rosas is to

9  have a hearing and make a determination.  And if my

10  determination ends up to be release, it could be subject to

11  verification of his medical condition with these medical

12  records next week.  And then you could appear before the duty

13  judge, not -- assuming that his condition is verified by the

14  records, I could make my findings and issue conditions today

15  too.  And that's another possibility.

16  　　　MR. RASCIA:  Judge, I would be willing to accept that

17  as a resolution.

18  　　　THE COURT:  Well, let me hear from the

19  government.  Okay?  I mean, I -- you know, Mr. Rosas's medical

20  condition is only one of the issues or factors that affect

21  whether he stays in custody or is released.  And, you know, I

22  would note that pretrial services made its recommendation of

23  release on home confinement without all the I's dotted and T's

24  crossed with respect to his medical condition based on his

25  self-report.

1    But they also looked at other things, such as his past

2 criminal history, his -- the stability of, you know,

3 relationships he has, where he is living, all the rest of the

4 stuff, which I think are also factors that we need to look

5 at.  So -- let me just think for a second.

6    (Brief interruption.)

7    THE COURT:  Yeah, I mean, I think I would like to go

8 forward with the hearing today.  I would like to hear what the

9 government has to say.  I would like to hear what the defendant

10 has to say, what Mr. Rosas has to say, maybe what Ms. Silerio

11 wants to say.  And rather than pushing this off on another

12 judicial officer, you know -- and without really even making

13 some -- any assumptions as to what we're going to get -- but I

14 would put that aside.  I mean, I -- I'm sympathetic to what

15 Mr. Storino is saying is, you know, a -- I -- what did

16 President Reagan say -- I can't believe I'm quoting President

17 Reagan -- trust, but verify, you know.

18    But, I would like to -- I would like to hear what the

19 government has to say.

20    MR. STORINO:  Your Honor, it was my understanding that

21 the Court wanted the records and that we were going to have a

22 hearing on the merits once we have the records.

23    THE COURT:  Uh-huh.

24    MR. STORINO:  So if the Court wants to have a hearing

25 now on the substance, then I would ask for a 10- to 15-minute

break.  I'll go get the original report, which I don't have
with me, I'll take a look at it, and we'd like to come back up
and put our position on the record, if that's what the Court
wants.

I don't think it is a good idea to address these
matters piecemeal.  We had a -- you know, a bond hearing a week
or so ago.  We have another now.  Perhaps we will have another
one next week or when your Honor comes back.  I think we should
do it all at once.

I'd also note that it is a presumption case.  It is
not the government's burden, it is the defense's burden.  So as
far as I can tell the defense has offered nothing to
demonstrate that he is not a flight risk or that he is not a
danger to the community.  And --

THE COURT:  Uh-huh.

MR. STORINO:  -- you know, just off the top of my
head, your Honor, while Mr. Rosas may not have fled to Mexico
when he had other charges pending, he committed multiple
crimes, multiple -- he has multiple new arrests and multiple
new convictions while on bond, while on parole.  And, in fact,
this very case he was just barely off parole for approximately
six months when he started selling guns to a confidential
source.

There is a litany of reasons, independent of what his
medical issues are, as to why he should be detained.  And if

the Court does want to have that hearing now, I would ask for

just five or ten minutes to obtain the report, review it

briefly, and then provide the Court with a fuller explanation.

MR. RASCIA: Judge, may I say something, please?

THE COURT: You say your -- based on the amount of

money that you got to pay Silver Cross Hospital for the medical

records you would -- you believe that they are voluminous

records?

MR. RASCIA: Well, Judge, my experience tells me that

what they normally charge per page, there is a significant

amount of documents to get it up to, in total, between the two

payments, it is over $270. So I would expect that there is

some substance there.

Judge, in fairness to the government, I don't mean to

try to ambush them. We did have a conversation before your

Honor came out. I indicated to Mr. Storino and Mr. Dunne that

I was going to relate to you that the records are now

available, we just have to get them.

You know, if -- if it is their preference to have the

records, in fairness, you know, I'm the one that said I was

going to get them, so I'll get them.

THE COURT: Yeah. You know, I mean, Mr. Rosas, this

is tough for me because honest to God if I weren't -- if I were

available next week, there is no question in my mind that I

would want to see the full story presented in front of me.

1  Okay?  I mean, I'm just kind of pushing here a little bit

2  because I'm not going to be.  And so I -- and I have been

3  thinking about your case and, you know, looking at all this

4  stuff.

5          But honest to God, if I were here on Monday,

6  Tuesday -- if I were here next week after you got the medical

7  records, I would continue this.  So I probably have to reign

8  myself in a little bit in terms of rushing this and having it

9  done more than once because whatever I say now -- I mean, I am

10 inclined -- I still am inclined to find out what your medical

11 records show in terms of your diagnosis and your

12 treatment.  That's a relevant factor in terms of where you

13 should best be accommodated.  And I don't have the full story

14 here.

15         I mean, you know, in terms of the presumption, I get

16 it, that it is a presumption case.  On the other hand,

17 Mr. Rosas was born in this country, is a U.S. Citizen, appears

18 to have a supportive family and significant other who thought

19 enough to come to court.

20         Since he was released -- I understand he has an

21 extensive criminal record.  And I have looked at it a lot.  And

22 I tried to look very carefully to see what arrests there were

23 while on parole or probation or bond.  And actually I didn't

24 see a whole lot.  You know, it seemed to me that when he was

25 released to parole or bond he was actually compliant.

1          There is an arrest in '06, it looks like, the

2    aggravated battery public place is while on bond.  But I didn't

3    see any others.

4          Are there any others -- or you don't have the report

5    with you --

6          MR. STORINO:  I don't have the report with me, your

7    Honor.

8          THE COURT:  -- so that you weren't prepared for the

9    hearing.

10          MR. STORINO:  I know he had at least one.

11          THE COURT:  Yeah.  I think he has one.  You know, and

12    an extensive history.  And then he was released in -- you know,

13    in 2011 after serving a substantial amount of time.  His parole

14    was -- am I right about 2011?

15          Yeah, 12 --

16          MR. RASCIA:  Yeah, he was released on parole on

17    December 30th.

18          THE COURT:  Yeah, 12-30.  Yeah, December 30th, 2011.

19    And that was discharged on August 13th, '4 -- 2014.

20          There are a couple of arrests, both nolle pros'd

21    during that time.

22          Actually they are not even during that time, they were

23    before 2011, so -- but even if you were to rebut the

24    presumption, it remains in the case.  Oh, man.

25          Well, Mr. Rosas, I think the government is right, and

1    I think even your counsel knows that they are right that this

2    all should be done at once when the government is prepared and

3    when your lawyer can address all of the -- everything in one

4    place.

5              And I know Mr. Silerio came today anticipating

6    potentially a hearing.  But despite my being anxious to get it

7    done, I don't know that my not -- not being available is an

8    excuse to get it done without all of the evidence that I would

9    want to hear.

10             MR. RASCIA:  Judge, who is -- if --

11             THE COURT:  I can't tell you.

12             MR. RASCIA:  Well, what I was going to suggest is if

13   you set a date for when you return, in the meantime if I give

14   the government what they want and we both say we're ready for a

15   hearing, we'll just contact who --

16             THE COURT:  The magistrate judge.

17             MR. RASCIA:  All right.  But in the meantime at least

18   there will be a date here.  And then Mr. Rosas can decide if he

19   wants to wait for you to come back or if he wants to see the

20   emergency -- the duty magistrate.

21             THE COURT:  You could do a choice of forum.

22             MR. RASCIA:  Well, I didn't mean to quite say it that

23   way, but --

24             THE COURT:  Well --

25             MR. RASCIA:  You know, the government may want some

1    additional information, and we'll have time to get it then.

2         THE COURT:  Okay.

3         MR. RASCIA:  You know, quite honestly one of the

4    things that I was trying to look into was the record from one

5    of his prior convictions, which we had to order, and that file

6    is not available.  We were trying to make it available so

7    Monday, when we're in Will County, we could see the file.

8         THE COURT:  Okay.  Well, so you're still gathering

9    information.

10        MR. STORINO:  Actually, your Honor, just to elaborate

11   on that, we received some records, in fact today, by email from

12   our agent about the criminal history of these defendants who

13   were arrested in this case, including Mr. Rosas.  I haven't

14   even looked at them.  They are buried in my email.  I believe

15   there were about a hundred pages worth.  Not all is

16   (unintelligible) Mr. Rosas, but he was included in it.  And so

17   that would be something else that would shed some light on what

18   exactly he was convicted of.  And I believe there are also some

19   facts included as to the underlying facts of those convictions,

20   which I think would help the Court as well.

21        THE COURT:  And are you going to give those to

22   Mr. Rascia?

23        MR. STORINO:  If your Honor would like us to, we're

24   willing to.  It is not discovery technically, but --

25        THE COURT:  No, but if you are going to reference it

1    during the detention hearing --

2              MR. STORINO:  That's fine.

3              THE COURT:  -- then he should see it.  And rather than

4    have it -- giving it to him then and then recessing so that he

5    can look at it, if you are going to reference it, he should see

6    it because the Court will -- if the Court is going to make a

7    ruling based on it, then the other side should see it.

8              MR. STORINO:  Perfectly fair, your Honor.

9              THE COURT:  All right.  So as you can hear, Mr. Rosas,

10   the lawyers even were planning on getting some more

11   information.

12             I'm not going to preempt the process.  I -- as I said,

13   if I were here -- I'm 100 percent -- I would not have -- I

14   would not preempt the process.  And there are a lot of good

15   judges in this building, and -- so let's set a date, and you

16   guys can decide.  Okay?

17             How does March 29th in the afternoon look for you?

18             MR. RASCIA:  I think that's fine, Judge.

19             THE COURT:  Okay.  1:45.  So that's your Column A.

20             MR. RASCIA:  Okay.

21             MR. STORINO:  Thank you, your Honor.

22             THE COURT:  And I will -- I will give a heads-up to

23   the person who is -- I do know who the person will be on duty

24   next week.  I cannot tell you that because obviously, you know,

25   that -- how they guard this stuff.  But I will give a heads-up

1  to that person that this might be coming down the pike or it

2  might not.  Okay?

3          Is that okay with you?

4          MR. RASCIA:  That's fine, Judge.  Thank you for your

5  courtesy.

6          THE COURT:  So what I am going to do, Mr. --

7          MR. STORINO:  Thank you, your Honor.

8          THE COURT:  What I am going to -- I am going to

9  continue to hold you in custody, Mr. Rosas.

10         I'm sorry, Ms. Silerio.

11         I'm going to set this for a hearing if the parties

12  want a hearing on that date on March 29th at 1:45.

13         I'm going to also provide that -- in my order that any

14  information that the government intends to proffer at the

15  detention hearing or that the defendant intends to proffer at

16  the detention hearing should be provided to each side before

17  the hearing.

18         MR. STORINO:  Yes, your Honor.

19         THE COURT:  Okay?  And I will -- and I'll also say

20  that if the hearing is going to be in front of me, if you would

21  give it to -- bring it here on the 28th, I'll be able to look

22  at it before the hearing.  Okay?

23         MR. STORINO:  Yes, your Honor.

24         THE COURT:  And then if you choose to go forward with

25  this after everybody has the information, that's fine too.  All

1    right?

2        MR. RASCIA:  Thank you.

3        THE COURT:  All right.  Mr. Rosas, that's the best I

4    can do right now.

5        THE DEFENDANT:  Thank you.

6        MR. STORINO:  Thank you, Judge.

7        THE COURT:  Yeah.

8      (Which concluded the proceedings.)

9                        CERTIFICATE

10        I certify that the foregoing is a correct transcript

11    from the digital recording of proceedings in the above-entitled

12    matter to the best of my ability, given the limitation of using

13    a digital-recording system.

14

15

16    */s/Pamela S. Warren*                July 5, 2018
      Official Court Reporter                      Date
17    United States District Court
      Northern District of Illinois
18    Eastern Division

19

20

21

22

23

24

25