1   **TRANSCRIBED FROM DIGITAL RECORDING**

2                   IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
3                          EASTERN DIVISION

4   UNITED STATES OF AMERICA,            )
                                         )
5                   Plaintiff,           )
                                         )
6             vs.                        )  No. 16 CR 107-1
                                         )
7   GABRIEL ROSAS, also known as Gabe,   )  Chicago, Illinois
                                         )  April 5, 2016
8             Defendant.                 )  1:09 P.M.

9      TRANSCRIPT OF PROCEEDINGS - Detention Hearing (Continued)
        BEFORE THE HONORABLE JEFFREY T. GILBERT, Magistrate Judge
10
    APPEARANCES:
11
    For the Government:        HON. ZACHARY FARDON
12                             219 South Dearborn Street
                               Chicago, Illinois  60604
13                             BY:  MR. WILLIAM DUNNE

14
    For the Defendant:         RASCIA & HIMEL, LTD.
15                             650 North Dearborn Street
                               Suite 700
16                             Chicago, Illinois  60654
                               BY:  MR. ROBERT LOUIS RASCIA
17

18  ALSO PRESENT:              Mr. Matthew Bonestroo
                               Pretrial Services
19

20                     PAMELA S. WARREN, CSR, RPR
                          Official Court Reporter
21                      219 South Dearborn Street
                              Room 2342
22                     Chicago, Illinois   60604
                           (312) 408-5100
23
    **NOTE:  Please notify of correct speaker identification.**
24  **FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS**
    **UNINTELLIGIBLE.**
25

1      (Proceedings held in open court:)

2          THE CLERK:  16 CR 107, United States of America versus

3  Gabriel Rosas for continued detention hearing.

4          MR. DUNNE:  Good afternoon, Judge Gilbert.  Assistant

5  United States Attorney William Dunne, D-u-n-n-e, on behalf of

6  the United States.

7          THE COURT:  Good morning -- good afternoon.

8          MR. RASCIA:  Good afternoon, your Honor.  Robert

9  Rascia, R-a-s-c-i-a, for Mr. Rosas, and he's present.

10          THE COURT:  Okay.  Good afternoon to both counsel and

11  to Mr. Rosas.

12          THE DEFENDANT:  Good afternoon.

13          THE COURT:  And we have from pretrial services?

14          MR. BONESTROO:  Good afternoon, your Honor.  Matthew

15  Bonestroo on behalf of pretrial services.

16          THE COURT:  Okay.  We are here for a continued

17  detention hearing in Mr. Rosas's case.

18          Are both of you prepared to proceed?

19          MR. RASCIA:  Judge, I am.

20          MR. DUNNE:  Your Honor, the government received

21  medical records this morning, a couple of hours ago.  We have

22  not had the opportunity to review all those medical records

23  yet.

24          THE COURT:  Well, I got a letter -- did -- Mr. Rascia,

25  did you get a copy -- let me see if you were copied on it.  You

1  are.

2      Did you get a copy of Mr. Dunne's cover letter to Amy

3  Standifer Melott, an attorney at the Bureau of Prisons, sending

4  her a copy of the letter from Dr. Mohan, who is the clinical

5  director at MCC Chicago, about Mr. Rosas's medical condition?

6      MR. RASCIA:  I did, Judge.  And let me further

7  explain.  I was out last week.  While I was away, Mr. Rosas's

8  records that we had requested and paid for were finally sent to

9  us.  We were left with the impression that we would be allowed

10 to pick them up.  And when we tried to do that, we were told

11 that they could only be sent by courier.  So we provided our

12 FedEx billing account number and asked that they be sent, but

13 they didn't do that in a very prompt fashion.

14     Yesterday, which was my first day back, I went through

15 this rather large stack of material, and we pulled out some

16 relevant documents that I thought we should share with the

17 government, and we're happy to share with the Court.

18     I would note, as I told Mr. Dunne in a telephone

19 conversation this morning, what I learned from reading these

20 documents was that Mr. Rosas's cancer situation is in

21 remission.  I would note that based on what I read in the

22 reports that I had is consistent with what's in the letter from

23 this -- from the doctor.

24     I do have a set of the same material that I provided

25 to Mr. Dunne today to share with your Honor if you're

interested in looking at that.  And as I said, I pulled some of these from the more voluminous set of reports that we had.  These are periodically dated over a couple of year-period.

I did note from going through the records that I received that the records stop in March of 2014.  I spoke with Mr. Rosas earlier today, and he advised me that there was continuing treatment after March of 2014.  And we have prepared another consent form.  And we're going to try to find out if there is any additional records.

But he does tell me, consistent with what I read in the March 2014 report, that he has been in remission, and he has not had an additional chemotherapy treatment since March of 2014.

What he has had, which is consistent with the doctor's letter, is every -- periodically, every three to six months, he goes, they draw blood, they analyze it.  And nobody has told him he's cancer free.  The most they have told him is that he's in remission.

So I'm happy to share these documents with your Honor. But I caution by saying that what I read in the reports I already had was consistent with what's in the doctor's letter.

THE COURT:  Well, I don't think I -- I'm not a doctor, and so I -- I don't know that I am going to understand the medical records, unless you wanted to point me to particular

things, which I don't think you do.  The -- you know, a

relevant fact is what I read in the letter from

Mr. -- Dr. Mohan, which I am going to docket, but put under

seal because it discusses Mr. Rosas's private medical

condition.

But then I have to quote from it to the extent that I

am relying upon it in a public hearing and decision, you know,

that it -- it does -- well, it does say, as you have

acknowledged, that Mr. Rosas is in remission.  And whether or

not he received treatment after March of 2014 or not, the

letter indicates that, you know, some time in or about 2014 he

was at that point determined to be cancer free, and that the

MCC did do a PET, CT scan of his entire body on March 8th, and

that that scan revealed no cancerous activity, metastatic

disease, no active cancer cells or recurrence.  So that -- to

the extent the medical records that you have are consistent

with that, I don't need to review them myself to confirm that

they are consistent with that.

I note that Mr. Rosas told pretrial services, or at

least it says in the pretrial services report on March 1st --

is it March 1st, 2008, or is it a different date?  No, March

1st, 2016, that it says that he advised he is presently under

the care of an oncologist and receives, present tense,

chemotherapy every three months at Silver Cross Hospital.

From Dr. Mohan's letter, I'm understanding that that

1  is not technically the case, that he's not currently receiving

2  chemotherapy.  He has a port, a shunt in his chest that would

3  allow him to receive chemotherapy.  I'm not sure why it

4  continues to be there.  But that he's not on and -- an ongoing

5  every three-month basis through 2015 and 2016 receiving

6  chemotherapy.

7        Obviously if the cancer recurs in some way, I -- my

8  guess would be that he would get treated for it.  But right now

9  he is not being treated.  That's my understanding.

10       Is that your understanding?

11       MR. RASCIA:  Judge, my understanding is that when he

12  goes for these visits, they draw blood, he's given medication.

13  I didn't see anything in the reports that I had which

14  go -- which end in March of 2014.  That was the last chemo that

15  I think he received.

16       Now I asked Mr. Rosas about that, and all he was able

17  to tell me is that when he has these visits, they administer

18  medication to him.  I'm only comfortable standing on what I

19  read.  And one of the reasons that I requested the records was

20  that at the very least to verify that Mr. Rosas had the

21  condition that he had told pretrial that he did.

22       Beyond that, I'm not a doctor either.  I did look up

23  some of the terms to familiarize myself with them, and I'm

24  comfortable saying to you that what I read is consistent with

25  what's in the doctor's letter of April 5th.

1       THE COURT:  Okay.  Do you have any objection to my

2  docketing, just for -- so it is in the record, Dr. Mohan's

3  record -- Dr. Mohan's letter of April 5th, but making sure that

4  it is under seal?

5       MR. RASCIA:  I would prefer that it be under seal.

6       THE COURT:  Okay.  Well, I mean, I too am prepared to

7  go ahead with today's hearing.  I guess we should see how it

8  comes out before I see whether or not I -- whether it is

9  necessary for the government to review the records more and

10 weigh in on what they say over and above what Dr. Mohan

11 says.  I mean, I -- there -- we have been continuing

12 Mr. Rosas's hearing for some time.  The defense now is ready to

13 go, and I'd like to hear what the evidence is going to be in

14 front of me so that we can see where we are.

15      MR. DUNNE:  Your Honor, respectfully, as the Court is

16 well aware, on March 28th, 2016, the government filed a

17 memorandum in support of continued detention of defendant

18 Rosas.  We were prepared to proceed on March 29th at the

19 hearing.  You will recall at that time the defense was not

20 ready to proceed at that time.

21      THE COURT:  Uh-huh.

22      MR. RASCIA:  And at that hearing we were informed that

23 medical records would be used as mitigation in this

24 hearing.  And, Judge, those were records that we -- we, as the

25 government, did not subpoena.  They are Mr. Rosas's.  And, you

know, with his privacy, we waited to receive those.  We

received them this morning.  I -- if I recall correctly over

the last couple of hearings, the Court did indicate that you

wanted the government to review that -- those records before we

came in and weighed in if they were going to be used by the

defense.

So, Judge, that's where we are at.  We have a full

briefed memorandum in support of continued detention.  We have

been ready on numerous occasions.  We have been told that there

was, you know, mitigation in the form of these medical records.

And now we have them.  And if the Court is asking the

government, are you ready to proceed?  Well, the government

received the records and would like to review them so we can

give the Court an intelligent answer.

THE COURT:  But I guess I would like to proceed

because the -- according to -- according to the defense, what

those records are going to show when the government thoroughly

reviews them is that Mr. Rosas had -- was diagnosed with

cancer, was treated for cancer, right now is in remission for

that cancer, and has not obtain -- and is not receiving

treatment right now.

If that's the fact, A, that's a little different than

what Mr. Rosas told pretrial services; and, B, in terms of the

mitigating conditions that we have here, Mr. Rosas is currently

not receiving chemotherapy.  So that there is no treatment,

according to Dr. Mohan, that he needs that he can't be receiving while incarcerated. Those are facts that are favorable to the government.

All right. Frankly, there are other issues that I would like to hear from -- you know, with Mr. -- from Mr. Rascia. I mean, it is a presumption case. So there is a -- and there is a presumption of detention. The government has filed a memorandum. I have gave the defense an opportunity to respond to it. They are obviously not going to respond to it. Mr. Rascia, if he is going to respond to it, at all, is going to do it orally.

I now -- I now know what his medical condition is, and I'm not sure I need the government to weigh in more on that. If I do need the government to weigh in more on that, I'm going to give you the opportunity to do that.

There are other issues that I would like to have addressed. And this is a situation where we have put off Mr. Rosas's detention hearing for a long time. And the Bail Reform Act says that it should be held very, very promptly. And so when I get to a situation where the government -- where the defendant is ready to proceed and the government has one small -- one issue, which is the medical records out there, but at least now we know what the defense says those medical records say, I would like to hear from Mr. Rascia on the reasons that he thinks Mr. Rosas should be released. I'd like

1   to hear from you, and I'd like to see whether or not I need to

2   continue the hearing for more information or I'm in a position

3   to rule on it now subject to any more information that I might

4   get from Mr. Rosas.

5           MR. DUNNE:  Yes, sir.

6           THE COURT:  Mr. Rascia.

7           MR. RASCIA:  Judge, in regards to the medical

8   situation, as I indicated earlier, I'm standing on the letter

9   that was authored, which we received today.  I think it is

10  consistent with what I know from my reading of the medical

11  records.  And part of the reason to continue this matter was to

12  verify that Mr. Rosas had the conditions that he said he had.

13          Beyond that, in regards to the memorandum filed by the

14  government, that's basically the same information that's in the

15  pretrial services report, albeit with a little further detail

16  as some of the underlying facts relating to those prior

17  convictions.

18          THE COURT:  Uh-huh.

19          MR. RASCIA:  I think the most relevant thing in the

20  government's memorandum is the reference to the fact that the

21  defendant may be looking at some upward adjustment in his

22  guideline calculation based on those prior convictions under

23  either an application of the career offender guideline or an

24  alternative.  I don't think they were asserting that it was an

25  armed career offender situation.

But even if we're looking only at the career offender guideline application in this case, I would note that the Seventh Circuit has repeatedly held that that is a factor to consider the application. It is not a mandatory application any longer, because like any other guideline application, it is advisory. And I have had the experience with judges in this building who have not made that application, even though the facts would support application.

Having said that, we do have a witness available here today who is in a dating relationship with Mr. Rosas. Her presence here today would be to verify that there would be a place for Mr. Rosas to stay at her residence in Harvey, Illinois. She lives there with -- it is a two-level home. The witness's mother lives on the first floor, and she lives in the upstairs apartment with her 14-year-old daughter. It is a child she had from a relationship years back. She does receive financial support from the child's father, so that would not be an obligation of Mr. Rosas.

He would have a place to stay comfortably. There is a room available for him there. She's more than willing to have him stay there. The pretrial services report does recommend an unsecured bail with conditions, the conditions being that he be on home confinement. We're perfectly fine with that.

If the Court would consider that type of release, I think it is important for a couple of reasons. If I were a

1    39-year-old-young man and having already gone through, for the

2    last five years, dealing with the issue of having been told

3    that you have testicular cancer and it has now become spread to

4    other areas of your body, and knowing that your father died of

5    that same malady at a relatively young age, and, you know, when

6    I -- it stuck out with me because that's exactly how old I am.

7    And I am -- certainly wouldn't want to pass away at 59 years

8    old from -- as everybody knows, many people fight cancer, and,

9    unfortunately, more often than not, cancer wins.

10          To be on home confinement, certainly Mr. Rosas would

11    be able to pick up a phone, schedule an appointment to visit

12    his doctor, if necessary, at his convenience, as opposed to

13    waiting for someone at an institution to decide if and when he

14    needs to see a doctor.  I'm not a doctor.  Cancer obviously is

15    a very difficult disease to deal with on any level, let alone

16    if you were in the free world, as opposed to being in

17    custody.  His check ups have indicated he's in remission.  That

18    doesn't always turn out to be the case.  But, again, I'm not a

19    doctor.

20          In regards to the government's other points that they

21    have raised in their pleading, I -- certainly on my way out the

22    door of law school they didn't give me a large eraser to erase

23    somebody's prior criminal history.  That's something,

24    obviously, that's going to follow Mr. Rosas around the rest of

25    his life.

1    I would note that he has always fulfilled his

2    obligations, meaning he went to court.  He's pled guilty in

3    some of those cases.  He accepted the punishment.  He went off

4    to prison and served the sentences.

5         If we take that in the context of what went on in this

6    case, the events that give rise to the charges in this case,

7    occur in December of 2014 and March of 2015.  Through the use

8    of a confidential source, there is a couple of claim

9    transactions involving Mr. Rosas.  And the government certainly

10   knew where Mr. Rosas was that entire time.  And if the

11   government had this overwhelming concern for the safety of the

12   community, they probably could have arrested Mr. Rosas the very

13   day that the December transaction took place.  They chose not

14   to do so.

15        So I think any claim that there is a concern for the

16   safety of the community, while apparently it took them 11

17   months to make that decision, because that's how much time went

18   by between the last event and when they decided to go arrest

19   him, and they certainly knew where to go to arrest him because

20   they found him there and they brought him to court.

21        Now I would think that probably a major concern for

22   the Court are these self-reported episodes that Mr. Rosas had

23   where in, I believe, late 2015 into 2016 he crossed over the

24   U.S.-Mexico border at or near El Paso without the use of a

25   passport.  Well, first of all, I would commend Mr. Rosas for

being very candid with pretrial services in telling them about that event because otherwise no one would even know about it.

Number two, his explanation to me is that he crossed at a foot bridge with another family member presenting as documentation his birth certificate, social security card, Illinois State issued identification card, and his Illinois driver's license. He crossed over -- excuse me -- spent the day, came back to the U.S. The purpose of those trips, every one of them, was to visit an ill family member who then later on passed away. It was the only purpose for those trips, and he self-reported them.

Now I don't have a further explanation of why someone at the border would allow him to cross with just those documents, but he has no U.S. Passport. He's never applied for a U.S. Passport. And his event in crossing over was not to conduct any criminal activity, it was a family social wellness visit.

Judge, I do have a witness to present to you who will testify that she is willing to be Mr. Rosas's third-party custodian and give further testimony about their living arrangements. So with that, I would like to call her forward if the Court or the government has questions for her.

THE COURT: I have a couple of additional questions before we hear from your witness who I think is Ms. Silerio, is that right?

MR. RASCIA:  That's correct, your Honor.

THE COURT:  One, Mr. Rosas has been coming to court since he was arrested, I think, in a wheelchair.  I mean, I think he was standing the first time, but I think he also took advantage of my offer to sit.

I'd like to know a little bit more about -- he told me he fell.  I think you told me maybe he fell off the top bunk, hurt his back, his shoulder.  I would like to understand the letter from the -- Dr. Mohan does not address any of that.  I would like to ask you if you know or you could tell me what his physical condition currently is.

MR. RASCIA:  Judge, Mr. Rosas tells me that on two occasions since he has been in custody, he's felt physical weakness which has caused him to fall over.  The one incident was he went to upright himself in the upper bunk he was in, became weak, and he fell out the bed.

On another occasion, actually while he was standing, I believe with the assistance of a walker, he fell backwards because he felt weakness, which he -- it is a sensation that he feels from time to time given -- mostly attributable to his prior health situations that he has had.

So in regards to any current medication, the only medication he's received since he has been in custody is Tylenol.  So there have been two incidents where he fell.

THE COURT:  Is he on any medications in the outside

world?  I mean, I saw that he had been prescribed some pain
killers or prescriptions that he did not fill.  Is he -- does
he take -- I think there was Ambien, which is not a painkiller,
I think, but -- maybe it is, I don't know -- and Valium.

Does he take any prescriptions on the outside that
he's not being allowed on the inside?

MR. RASCIA:  Judge, in the medical records that I
looked at there were a series of medications that have been
prescribed to him over time, mostly for pain medications.

Mr. Rosas told me that over time he would try to avoid
taking the medications as much as he could because they gave
him a heightened sense of nauseousness and general
discomfort.  So, you know, he has from time to time made the
decision that he would perhaps rather deal with the pain than
the nauseousness, but that's an individual choice that he's
made.

THE COURT:  And he has a -- he has a problem with his
-- I think it is his left arm, a nerve problem, is that right?

Do you know anything about that?

MR. RASCIA:  Judge, I'll ask him.

(Discussion off the record.)

MR. RASCIA:  Judge, that's a recent issue that
developed when he was taken to the hospital and they went to
draw blood.  Apparently the process by which the blood was
drawn, the needle was put in an area where it may have hit a

nerve.  It is a recent thing.  And he does -- can still feel
the effects of it, but it is not debilitating.

THE COURT:  The pain that caused him -- causes him to
smoke marijuana three times a day, is that pain related to the
arm, pain related to the cancer, what is it pain -- or, I mean
-- it says he smokes marijuana three times a day for pain
management purposes but believes he could stop on his own.

What's that about?

MR. RASCIA:  Judge, that was his form of self-
medicating as opposed to taking the other meds that would have
dealt with the pain but caused him to be nauseous.

THE COURT:  And is this pain related to the arm, pain
related to the cancer that's in remission, pain related to
something else?

MR. RASCIA:  Spinal issues, your Honor.

THE COURT:  And --

MR. RASCIA:  Not the arm.  The arm is a recent
situation.

THE COURT:  Spinal issues that predated his
incarceration?

MR. RASCIA:  Yes.

THE COURT:  Okay.  None of those are really referenced
in the pretrial services report.  Are they referenced in the
medical records that you have?

MR. RASCIA:  Judge, the medical records do indicate

1    treatment for spinal issues.

2          THE COURT:  What kind of spinal issues?  Nerve

3    impingement?  Broken bone?  Or you don't know?

4          MR. RASCIA:  Judge, I'll be honest with you, there is

5    a very large stack of records --

6          THE COURT:  Uh-huh.

7          MR. RASCIA:  -- and my review was to look for the

8    records relating his --

9          THE COURT:  The cancer.

10          MR. RASCIA:  -- diagnosis of cancer, and the treatment

11    he gave.  But I did note that there were other issues

12    addressed.

13          THE COURT:  Okay.

14          MR. RASCIA:  Judge, could I have one second, please?

15          THE COURT:  Yeah, you can get some water.  There

16    should be some water there.

17        (Brief interruption.)

18          MR. RASCIA:  Judge, actually part of that treatment

19    relating to the spine and the pain medication, Mr. Rosas back a

20    few years ago, was a crime victim himself.  He was stabbed

21    several times and hit in the head multiple times.  So that's

22    what that related to.

23          THE COURT:  Okay.  Do you want to bring Ms. -- I don't

24    want to mispronounce her name.  Silerio?  Silerio?

25          MR. RASCIA:  Silerio.

1          THE COURT:  Silerio.

2          MR. RASCIA:  Judge, would you prefer she go on the

3     witness stand?

4          THE COURT:  I think it is okay if you want to stand

5     there.  I just would swear you in.

6          THE WITNESS:  Yeah.

7          THE COURT:  Could you tell me who you are?

8          THE WITNESS:  Christina Silerio.

9        (Witness sworn.)

10          THE COURT:  And Mr. Rascia is going to ask you some

11    questions.  And then I'm going to have some follow-up questions

12    or Mr. Dunne might have questions for you.

13          I want to tell you with respect to my questions or

14    Mr. Dunne's questions, you're not required to answer my

15    questions or you could talk to Mr. -- or Mr. Dunne's questions,

16    you could -- well, Mr. Dunne's questions are a little

17    different, I guess.

18          You're not required to answer my questions.  Or,

19    frankly, if you don't want to answer Mr. Dunne's questions,

20    you're not a party here, you're not on trial here, if you don't

21    want to answer anything or you don't want to answer anything

22    until you have had a chance to talk to Mr. Rascia or Mr. Rosas,

23    that's fine too.

24          Do you understand that?

25          THE WITNESS:  Yes.

1          THE COURT:  Okay.  Go ahead.

2       (Witness sworn.)

3       CHRISTINA SILERIO, DEFENDANT'S WITNESS, DULY SWORN

4                     DIRECT EXAMINATION

5   BY MR. RASCIA:

6   Q.  Can you please tell us your full first and last name?

7   A.  Christina Silerio.

8   Q.  Keep your voice up so everybody in the room can hear you.

9   A.  Christina Silerio.

10  Q.  Can you spell your last name?

11  A.  S-i-l-e-r-i-o.

12  Q.  Ms. Silerio --

13          THE COURT:  Well, wait.  Hold on.  Let me write that

14  down because that's different than what was in the --

15          THE WITNESS:  Yeah, it is different.

16          THE COURT:  S-i what?

17          THE WITNESS:  S-i-l --

18          THE COURT:  Uh-huh.

19          THE WITNESS:  -- e-r-i-o.

20          THE COURT:  Okay.

21  BY MR. RASCIA:

22  Q.  And where do you live?

23  A.  15710 South Carse Avenue, Harvey, Illinois.

24  Q.  Can you spell the name of the street you live on?

25  A.  C-a-r-s-e.

1  Q.  And how long have you lived at that address?

2  A.  Oh, it has been a couple of years.  Like at least 2000 and,

3  what, two?

4  Q.  All right.  And who did you live at that address with?

5  A.  My mother.

6  Q.  And anyone else?

7  A.  That's it.

8  Q.  Do you have a child?

9  A.  Yeah, a child.  She's 14.

10  Q.  And does she live with you as well?

11  A.  Yes.

12  Q.  All right.  And if his honor, Judge Gilbert, were to allow

13  Mr. Rosas to be released on bail, would there be a convenient

14  place for him to stay within your household?

15  A.  Yes.

16  Q.  And can you describe for his Honor, Judge Gilbert, what

17  your relationship is to Mr. Rosas?

18  A.  I have been with him for a year.

19  Q.  All right.  Would you consider that to be a social dating

20  relationship?

21  A.  No, actually it is like -- kind of like we're together,

22  like kind of like husband and wife thing going.

23  Q.  All right.  And if his honor, Judge Gilbert, were to allow

24  Mr. Rosas to be released on bail, would you be willing to act

25  as his third-party custodian?

1  A.  Yes.

2  Q.  Which would mean that you would have an obligation to the

3  Court to notify the Court if Mr. Rosas violated any of the

4  conditions of his release?

5  A.  Well, of course, I will.

6  Q.  Which would mean that, for example, if he were ordered to

7  not use any illegal drugs, and he smoked marijuana, you would

8  have an affirmative duty to report that to the Court.

9  A.  Yes.

10  Q.  Would you be willing to do that?

11  A.  Yes.

12  Q.  Would you be willing to do that knowing that if you did

13  report that, there is a high probability that his bail would be

14  revoked and he would be taken back into custody?

15  A.  Yeah.

16  Q.  Do you also understand that if you didn't report it and it

17  was proven that you were aware of the situation and didn't

18  report it, you potentially could be charged with a crime?

19  A.  Yes.

20  Q.  So knowing all that, you would still be willing to act as

21  his third-party custodian?

22  A.  Yes.

23  Q.  All right.  Are you currently employed?

24  A.  No, not right now.  I don't have a job right now, but --

25  Q.  Were you laid off --

1   A.  -- I am actually --

2   Q.  -- from your most recent job?

3   A.  Yeah, I was -- yes, I was laid off.  So actually right now

4   I'm looking for a job so I should be working soon.

5   Q.  If you were to become employed, you wouldn't be in the

6   house the entire day, correct?

7   A.  No.

8   Q.  Would there be another adult on the premises during the

9   day --

10  A.  Yes.

11  Q.  -- if you went out?

12  A.  My mother.

13  Q.  All right.  And would you be willing to transport Mr. Rosas

14  to his court appearances, attorney visits, and medical

15  treatment?

16  A.  Yes.

17  Q.  All right.  And the final thing, Ms. Silerio -- two things.

18  Are you a United States citizen?

19  A.  Yes.

20  Q.  And have you ever been convicted of a crime?

21  A.  No.

22          MR. RASCIA:  Judge, I don't have anything further.

23          THE COURT:  Is there anything you want to ask

24  Ms. Silerio, Mr. Dunne, or anything you want me to ask her?

25          MR. DUNNE:  I have a few brief questions, Judge.

1       THE COURT:  Okay.

2       MR. DUNNE:  Fine.

3                       CROSS EXAMINATION

4    BY MR. DUNNE:

5    Q.  Ms. Silerio, you indicated that you are unemployed,

6    correct?

7    A.  Uh-huh.

8    Q.  How long have you been unemployed?

9    A.  Since I would say last summer.

10   Q.  Would that be June of --

11   A.  Last --

12   Q.  2015?

13   A.  Yeah.

14   Q.  And during this time you have been employed, you have lived

15   at the address of 15710 South Carse?

16   A.  Carse Avenue.

17   Q.  Carse Avenue in --

18   A.  Harvey, Illinois, yes.

19   Q.  Is that correct?

20   A.  Yes.

21   Q.  And during that time, did you live with your mother?

22   A.  Yes, I would be like -- yeah.  Yes.

23   Q.  And how old is your mother?

24   A.  My mom is like -- she has got to be like 55.

25       THE COURT:  A young woman.

1       THE WITNESS:  Yes.

2   BY MR. DUNNE:

3   Q.  Is your mother employed?

4   A.  She's -- yes.  She works at Allied Tool Company.  She has

5   been there for a lot of years.

6   Q.  And your daughter is -- does she go to school?

7   A.  Yeah, she goes to school.  She is about to graduate eighth

8   grade this year.

9   Q.  And you are primarily supported through LINK benefits,

10  correct?

11  A.  Yeah.

12  Q.  And how long have you been receiving LINK benefits?

13  A.  Since she was -- well, I applied for it when I got her

14  medical card, so it would be like after when she was growing

15  up.

16  Q.  Are you aware of what Mr. Rosas is charged with?

17  A.  Well, kind of because he is not really a bad person, he's

18  not --

19  Q.  Are you aware of what Mr. Rosas is charged with?

20  A.  Yeah.

21      THE COURT:  Do you know what --

22      THE WITNESS:  No, I don't.  I know --

23  BY MR. DUNNE:

24  Q.  You don't know what he's charged with.

25      Do you know --

1          MR. DUNNE:  I have nothing further.

2          MR. RASCIA:  Judge, may I?

3          THE COURT:  Yes.

4          Could you please inform Ms. Silerio of what Mr. Rosas

5    is charged with?

6                      REDIRECT EXAMINATION

7    BY MR. RASCIA:

8    Q.  Well, Ms. Silerio, you have had a conversation with me

9    about what the possible punishment is that Mr. Rosas could face

10   if he is convicted in this case, correct?

11   A.  Yeah.

12   Q.  And you were advised that he could receive a sentence of up

13   to 20 years, correct?

14   A.  Yes.

15   Q.  And we also had a conversation, you and I, about what the

16   accusation against him was.

17   A.  Yes.

18   Q.  Meaning you had an understanding that he was arrested

19   because the government alleged that he illegally sold a firearm

20   to someone.

21   A.  Yes.

22   Q.  You were also made aware that there was an amount of drugs

23   that was supposedly sold by Mr. Rosas to an informant.

24   A.  Yes.

25   Q.  So when you were asked earlier if you knew what the charges

1  were, you did have an understanding of what --

2  A.  I have a clue, but I just didn't really -- I don't know

3  like a --

4          THE COURT:  You're not a lawyer.

5          THE WITNESS:  Yeah.

6  BY MR. RASCIA:

7  Q.  All right.  And knowing that he possibly could face up to

8  20 years in prison, you're still willing to allow him to live

9  in your home, on home confinement, on electronic monitoring,

10 and serve as his third-party custodian?

11 A.  Yes.

12 Q.  And based on your relationship with him, do you have a

13 reasonable belief that he would appear in court at all times

14 when required?

15 A.  Yes.

16         MR. RASCIA:  Nothing further.

17         THE COURT:  Okay.  Ms. Silerio, I have a couple of

18 questions.  And, again, I want to remind you of what I said

19 before, you're not required to answer my questions.  If you

20 want to talk to either Mr. Rosas or Mr. Rascia before doing so,

21 I'm perfectly fine with you doing that.

22         Do you understand that?

23         THE WITNESS:  Yes.

24         THE COURT:  Because you're not charged with anything

25 here, you're not a party here, you're coming forward of your

1  own volition and free will to stand up for Gabriel Rosas.

2          Do you understand that?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  Did you know that Mr. Rosas went to

5  Mexico on three occasions within the last year or at least --

6  actually if you have been together for the last year -- on at

7  least two occasions since you guys have been together?

8          THE WITNESS:  Yes.

9          THE COURT:  Did you go with him?

10         THE WITNESS:  No.

11         THE COURT:  Do you know why he went there?

12         THE WITNESS:  Family situation.

13         THE COURT:  Oh, it was just a family situation?

14         THE WITNESS:  I think one of his family members was

15 sick out there.

16         THE COURT:  Do you know who it was?

17         THE WITNESS:  No, I don't.

18         THE COURT:  Do you know what the sickness was?

19         THE WITNESS:  I have no idea.  I just know he went two

20 times.

21         THE COURT:  Are there any guns in your house?

22         THE WITNESS:  In my house?  No.

23         THE COURT:  Uh-huh.

24         THE WITNESS:  No.

25         THE COURT:  Aside from when Mr. Rosas was there, and

1  he has told us and pretrial services that he smoked -- smokes

2  marijuana at least three times a day, that's what he --

3       THE WITNESS:  Well, I'm really thinking like he

4  probably does smoke for like eating, to get hungry, I'm pretty

5  sure.  I'm not sure.

6       THE COURT:  What you do you mean?

7       THE WITNESS:  I mean, some people -- some people smoke

8  to get hungry because some people don't eat.  Like the

9  situation that he's in, like cancer and stuff.  Like, you know,

10 what I mean?  You don't get hungry.

11      THE COURT:  Takes away his appetite?

12      THE WITNESS:  Yeah, he got --

13      THE COURT:  But what he told pretrial services is that

14 he -- he does that for pain management.  So -- whatever.

15      But other than Mr. Rosas, is there anybody else in

16 your house that uses any illegal drugs, controlled substances?

17      THE WITNESS:  No.

18      THE COURT:  You live with your mom?

19      THE WITNESS:  Yes.

20      THE COURT:  And what's the living situation?  Your mom

21 lives downstairs?

22      THE WITNESS:  It's a -- the bottom is the downstairs.

23 We live upstairs.

24      THE COURT:  So you and your daughter live upstairs.

25 Your mom lives downstairs?

1        THE WITNESS:  No, we live upstairs.  Downstairs is

2   another level, that somebody else lives down there.

3        THE COURT:  Okay.  So you, your mom, your daughter,

4   and Mr. Rosas --

5        THE WITNESS:  Upstairs, yeah.

6        THE COURT:  Upstairs.

7        THE WITNESS:  Yes.

8        THE COURT:  Does your mom own the home or do you rent

9   it?

10       THE WITNESS:  No, she rents the home, but her -- the

11  one that owns the building is her manager at work.

12       THE COURT:  Uh-huh.

13       THE WITNESS:  So it is basically like, you know,

14  family.

15       THE COURT:  Mr. Rascia asked you if you would feel --

16  if you understood that if Mr. Rosas violated the terms of his

17  bond, not only smoking marijuana, but there could be other -- I

18  mean --

19       THE WITNESS:  I mean, they could be like other things

20  that he like leaves or something like that.  I understand,

21  yeah, I would have to --

22       THE COURT:  You would have to rat him out.

23       THE WITNESS:  Yeah.

24       THE COURT:  And there are the other conditions too,

25  right?  I mean, he can't -- he can't have any contact with

1   certain people.  That could be a condition.

2            THE WITNESS:  Yeah.

3            THE COURT:  Another condition could be no alcohol or

4   no firearms.

5            Do you understand that?

6            THE WITNESS:  Yeah.

7            THE COURT:  And you would take that responsibility to

8   heart and seriously so that if he did do that, you would pick

9   up the phone --

10           THE WITNESS:  I would have to locate -- yeah.

11           THE COURT:  -- call pretrial services --

12           THE WITNESS:  Yes.

13           THE COURT:  -- and that would mean that somebody would

14  come and arrest Mr. -- or could come and arrest Mr. Rosas and

15  that he would no longer be with you.

16           Do you understand that?

17           THE WITNESS:  Yes.

18           THE COURT:  So why would you do that if doing that

19  would put him right back in jail?

20           THE WITNESS:  I wouldn't.

21           THE COURT:  Huh?

22           THE WITNESS:  I wouldn't.

23           THE COURT:  You wouldn't what?

24           THE WITNESS:  Put him back in jail.

25           THE COURT:  You won't want him to go back to jail?

1          THE WITNESS:  No.

2          THE COURT:  So -- but you're -- but do you know that

3   if you picked up the phone and called the pretrial services and

4   said, he's got a gun or he's smoking marijuana, that could

5   result in his going back to jail?

6          Do you understand that?

7          THE WITNESS:  Well, I would have to do that because

8   then I would get in trouble.

9          THE COURT:  Uh-huh.

10         THE WITNESS:  So --

11         THE COURT:  So you would do that because you have made

12  a promise to do that and you don't want to get in trouble for

13  it.

14         THE WITNESS:  Yeah.

15         THE COURT:  But you wouldn't want him to go back to

16  jail.

17         THE WITNESS:  I wouldn't want him to go back to jail,

18  but I wouldn't risk myself for, you know --

19         THE COURT:  For him.

20         THE WITNESS:  Yeah.

21         THE COURT:  Okay.  Any other questions that you have,

22  Mr. Rascia?

23         MR. RASCIA:  I do, Judge.

24         THE COURT:  Okay.

25                    REDIRECT EXAMINATION (Resumed)

1  BY MR. RASCIA:

2  Q.  You understand that what his honor, Judge Gilbert, is

3  getting to is even though you may not want him to go back to

4  jail, you have an obligation to make sure that he abides by all

5  the conditions of the bond.

6           Do you understand that?

7  A.  Yes.

8  Q.  And that overrides whatever personal feelings you may have

9  to Mr. Rosas.

10          Do you understand that?

11 A.  Yes.

12 Q.  You also understand that as part of your obligation to the

13 Court, to make sure that he abides by the conditions of the

14 bond.

15 A.  Yes.

16 Q.  And you're willing to do that?

17 A.  Yes.

18          MR. RASCIA:  Nothing further, your Honor.

19          THE COURT:  Anything further from you, Mr. Dunne?

20          MR. DUNNE:  Just very briefly.

21          THE COURT:  Okay.

22          MR. DUNNE:  Very briefly.

23                         RECROSS EXAMINATION

24 BY MR. DUNNE:

25 Q.  Ms. Silerio, you or your mother or your daughter do not own

1  the residence at 15710 South Carse Avenue in Harvey.

2  A.  No, she rents.

3  Q.  You do not rent the premises, correct?

4  A.  No.

5  Q.  Your daughter doesn't rent the premises.

6  A.  No.

7  Q.  Your mother is the one that pays the rent.

8  A.  Yes.

9  Q.  Correct?

10  A.  Uh-huh.

11  Q.  Your mother works, correct?

12  A.  Yes.

13  Q.  Your daughter goes to school, correct?

14  A.  Yes.

15  Q.  And you are -- do not work --

16  A.  No.

17  Q.  -- correct?

18          But you plan on working, correct?

19  A.  Yes.

20          THE COURT:  So the logical corollary of that is that

21  when you get a job there could be periods of time when you're

22  not home, your mom is not home, your daughter is not home.

23          THE WITNESS:  Yeah.  Well, my mom gets home, it is at

24  3:00 o'clock.  She goes to work like at 6:40 in the morning, so

25  -- and then it is just my mother and my child --

1          THE COURT:  Okay.

2          THE WITNESS:  -- and me.

3          MR. RASCIA:  May I ask her a question?

4          THE COURT:  Sure.

5                    FURTHER REDIRECT EXAMINATION

6    BY MR. RASCIA:

7    Q.  You currently are looking for employment, correct?

8    A.  Yes --

9    Q.  And --

10   A.  -- as we speaking now.

11   Q.  -- pursue a job that allows you perhaps to be home during

12   the day and work at night so there is always an adult present

13   on the premises with Gabriel.

14   A.  Yes.

15   Q.  And you don't have a job today.

16   A.  No.

17          THE COURT:  No, everybody -- we all understand she is

18   looking for a job.  She wants to -- she wants to get a job and

19   be employed.

20          THE WITNESS:  Yeah, I'm being -- I'm being honest.

21          THE COURT:  Okay.

22          Okay.  Ms. Silerio, one of the things that I need to

23   do if somebody is proposed as what's called a third-party

24   custodian is I usually ask for a background check to be run on

25   that person by pretrial services.  I have a pretrial services

1  officer here.

2           Would you be willing to talk to him and have him run a

3  background check on you?

4           THE WITNESS:  Yeah.

5           THE COURT:  Did you already run a background check?

6           MR. BONESTROO:  Your Honor, we haven't really run the

7  background check.

8           THE COURT:  Oh, I didn't get it I don't think.

9           Did I?

10          MR. BONESTROO:  On the -- the second page of the

11  addendum.

12          THE COURT:  Oh, wait.  I have to find the addendum.

13          Ah, I see.

14          MR. BONESTROO:  Yeah, the last sentence of the second

15  paragraph has --

16          THE COURT:  I forgot about the addendum.

17      (Brief interruption.)

18          THE COURT:  So I -- okay.  Thanks for the reference to

19  that.  You guys previously told me you got this.

20          Couple of things.  The pretrial services report said

21  that Mr. Rosas is supported by his sister.  Is that still the

22  case?

23          MR. RASCIA:  Judge, I talked to Mr. Rosas's sister.

24  She was providing him a place to live.  To be candid with the

25  Court, the fact that he's been charged with this crime, she

1  candidly told me she's upset about it and told me that she was

2  not willing to participate.  But up to the date that he was

3  arrested, he was living in her home and she was providing him

4  his necessities --

5          THE COURT:  Okay.  During --

6          MR. RASCIA:  -- and shelter.

7          THE COURT:  Okay.  Thank you for that correction.

8          And during the correct -- when you talked to pretrial

9  services, Ms. Silerio, I guess you -- you had previously spoken

10  to them.  You said, although you're presently not employed, you

11  needed to -- if I released Mr. Rosas to you or to your custody,

12  you would have to get a job in order to get enough money to

13  support a household with him there.

14          THE WITNESS:  Yes.

15          THE COURT:  If you don't get a job, is there not

16  enough cash flow to support Mr. Rosas?

17          THE WITNESS:  If I didn't have a job, I mean, my mom

18  is always there.  She always has -- helps me out all the time.

19          THE COURT:  Uh-huh.  But she would be the one who

20  would have to be --

21          THE WITNESS:  Yes.

22          THE COURT:  -- paying for food and --

23          THE WITNESS:  Well, I would pay for the food because I

24  have -- like I said, I get LINK cards so I don't have to pay

25  cash for foods when I buy.

1        THE COURT:  But when he was living with you after you

2   lost your job, you weren't supporting Mr. Rosas because his

3   sister was, right?

4        THE WITNESS:  Yeah.  Maybe she has a job -- or she has

5   a job.

6      (Brief interruption.)

7        THE COURT:  So before he was arrested Mr. Rosas was

8   living with you, your mom, and your daughter, right?

9        THE WITNESS:  Yes.

10       THE COURT:  And is your mom willing to have him come

11  back since he's been arrested?

12       THE WITNESS:  Did my mom what?

13       THE COURT:  Is your mom willing to have him come

14  back --

15       THE WITNESS:  Yes, I had --

16       THE COURT:  -- and live there?

17       THE WITNESS:  -- I was talking with her.  She knows

18  the situation.

19       THE COURT:  Is she okay with it?

20       THE WITNESS:  Yeah, she's okay with it.

21       THE COURT:  She's okay with him coming to live there?

22       THE WITNESS:  Yeah.  I mean, because she understands

23  that nobody else is going to -- his sister doesn't want nothing

24  to do with him, so --

25       THE COURT:  Anything further from anybody on that?

1    MR. RASCIA:  Judge, could I have one second, please?

2    THE COURT:  Yeah.

3    MR. RASCIA:  Am I allowed to speak to the --

4    THE COURT:  Yes, you can.  Yes, yes.

5    (Brief interruption.)

6    MR. RASCIA:  Your Honor, I asked Ms. Silerio if her

7  mom would be willing to come down and perhaps address you

8  because --

9    THE COURT:  Uh-huh.

10    MR. RASCIA:  -- I could see that the Court has some

11  concerns over that.  If you --

12    THE COURT:  Well, she works, right?

13    MR. RASCIA:  She does.  And apparently she gets off

14  around 3:00 in the afternoon.

15    THE COURT:  Well, I'm going to -- I'm going to make

16  this a little bit easier.  I'm -- I'm finding this a difficult

17  case.  All right?  This is a presumption case.  There is a

18  presumption of detention.  Mr. Rosas has to show that he rebuts

19  that presumption.  I have to think that -- and one of the ways

20  he rebuts it is by having somebody stick -- come in and stand

21  up for him, I realize that.  And then the presumption stays in

22  the case.

23    Right before I came on the bench, I got handed the

24  letter about his cancer diagnosis.  And then there is this

25  additional issue about his -- the spinal issues that you have

1  said cause pain that he then self-medicates.

2        What I would like pretrial services to do is -- and I

3  would like to continue this hearing on my own motion to Friday.

4  And I would like you to talk -- and maybe Ms. Silerio can

5  facilitate your talking to her mom so that she doesn't have to

6  take off work.  I really don't want her to have to take off

7  work to come down because that's losing pay or putting her in

8  jeopardy with her employer.  I really don't want her to have to

9  have some type of problem with her employment.  But I would

10 like you to talk to her to see whether or not she knows this

11 situation and whether she's willing, notwithstanding what

12 Ms. Silerio says, to have Mr. Rosas come back and live with

13 them.

14        Do you have problem with that, Mr. Rascia?

15        MR. RASCIA:  Absolutely not, your Honor.

16        THE COURT:  Ms. --

17        MR. RASCIA:  And what I was going to ask is if the

18 pretrial services officer could give me a number where she can

19 call him, and maybe during a break she has at work she can call

20 him.

21        THE COURT:  Right.  Do you think she would be okay

22 with that, Ms. Silerio?

23        THE WITNESS:  Yes.

24        THE COURT:  And then I was going to also give the

25 government time to look at those medical records and tell me

anything that they want to do.

I was going to put you on Friday.  Okay?  Because I would like some time, Mr. Rosas -- I mean, this -- this -- so let me just talk to you directly.  I mean, it is -- it comes down to you and me, I guess, and Ms. Silerio.

If you need water, Ms. Silerio, there is water in the --

THE WITNESS:  Okay.

THE COURT:  Yeah.

So this is a proceeding that has nothing to do with guilt or innocence.  It has nothing to do with the -- whether you're guilty or innocent of the charges against you.  That's before Judge Wood, and you're going to address that.

The sole issue here is under what's called the Bail Reform Act, whether you should be released or held in custody while these charges continue to pend.  And if you are continued held in custody, you would have the right to petition for release if conditions change or something like that.

So -- and I have to weigh a number of different factors.  I have to weigh -- first of all, there is a presumption given the crimes that you have been charged with and your criminal history of -- that you would stay in jail.  All right?  Unless there are conditions that can be imposed that would mitigate risk of flight or danger to the community.

And I look at things like the nature and circumstances

of the charges against you, the weight of the evidence, your
history and personal characteristics, which is the most
important, and any danger that your release would pose to the
community. One thing that's being proposed is that you be
released on home incarceration, which is one way you mitigate
danger to the community.

So there is a lot of things to factor in. I have
gotten a lot of more -- and one reason I wanted to go ahead
with this hearing was to -- we have been doing this a bunch,
and I wanted to get all the evidence on the table so that I
could have it in front of me.

I would like pretrial services to talk to
Ms. Silerio's mother just to find out where she is in this mix
since she's really the lessor -- the lessee of this property.

I would like the government to be able to -- there has
been additional information divulged here about your medical
condition. I would like Mr. Dunne to have a chance to look at
that.

And then I'm going to have you come back on Friday,
and I'm going to rule up or down on where we are on
this. Okay? So I just want you to know that.

You wanted to say something? Do you want to talk to
Mr. Rascia first before you say anything?

You could talk to him.

(Brief interruption.)

1              MR. RASCIA:  Nothing further, your Honor.

2              THE COURT:  Okay.  Now I would like to see you all

3    again at 1:30 on Friday.  Can you do that?

4              You can't?

5              MR. DUNNE:  Judge, if -- I know I'm available all

6    Friday morning, your Honor.

7              THE COURT:  Okay.  I can do Friday morning too.  I

8    have, possibly, a continuation of a pretrial conference on

9    Friday morning, but --

10             MR. RASCIA:  I think Mr. Dunne has an appointment over

11   at (unintelligible).

12             MR. DUNNE:  I have training again.

13             MR. RASCIA:  Your Honor, I have a 9:00 o'clock status

14   hearing with his Honor, Judge Durkin.

15             THE COURT:  You're free after that?

16             MR. RASCIA:  Yeah.  Well, I have some things in state

17   court, but I can call them --

18             THE COURT:  What about if I did it at 9:30?

19             MR. RASCIA:  9:30 would be perfect, or even 9:15.

20             MR. DUNNE:  9:30, 9:15, whatever is good.

21             THE COURT:  Why don't we say 9:30.  I mean, I -- just

22   because I don't know how long Judge Durkin's status is going to

23   take you.

24             MR. RASCIA:  Okay.

25             MR. DUNNE:  Judge, I believe I have training again at

```
 1   noon.  That would be my only reservation --

 2            THE COURT:  It won't last --

 3            MR. DUNNE:  If we were before --

 4            THE COURT:  -- past noon.

 5            MR. DUNNE:  -- 12:00.  But if I have to change that, I

 6   will, your Honor.

 7            THE COURT:  Okay.  No, I mean, let's come back at 9:30

 8   Friday morning, and I'll move my pretrial conference.

 9            All right.  I appreciate your patience.  Thank you

10   very much.

11            When you get this information, will you do another

12   addendum?

13            MR. BONESTROO:  Yes, your Honor.

14            THE COURT:  So you'll file it, and these guys will get

15   it?

16        (Unintelligible response.)

17            MR. RASCIA:  Thank you.

18            THE COURT:  Thank you.  See you Friday.

19            MR. DUNNE:  And, Judge, the defendant will remain

20   detained --

21            THE COURT:  Yes.

22            MR. DUNNE:  -- until Friday?

23            THE COURT:  Yes, yes, yes.

24            MR. DUNNE:  Thank you, Judge Gilbert.

25        (Brief interruption.)
```

1        MR. DUNNE:  (Unintelligible) to and including

2  Friday --

3        THE COURT:  Granted.

4        MR. RASCIA:  No objection.

5        MR. DUNNE:  -- in the interest of justice to prepare

6  for the hearing.

7        THE COURT:  No objection?

8        MR. RASCIA:  No objection.

9        THE COURT:  Granted.

10       MR. DUNNE:  Thank you, Judge.

11    (Which concluded the proceedings.)

12               CERTIFICATE

13       I certify that the foregoing is a correct transcript

14  from the digital recording of proceedings in the above-entitled

15  matter to the best of my ability, given the limitation of using

16  a digital-recording system.

17

18

19  */s/Pamela S. Warren*             July 7, 2018
     Official Court Reporter          Date

20  United States District Court
     Northern District of Illinois

21  Eastern Division

22

23

24

25