UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | 16 CR 107 |
| v. | ) | Honorable Andrea R. Wood |
| | ) | |
| GABRIEL ROSAS, | ) | |
| Defendant. | ) | |

### GABRIEL ROSAS' SENTENCING MEMORANDUM

NOW COMES GABRIEL ROSAS, by and through his attorney, Quinn A. Michaelis, and respectfully requests, pursuant to 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, that this Honorable Court impose a sentence of time served, because such a sentence is sufficient, but not greater than necessary, to comply with the purposes of sentence. In support of this motion, Mr. Rosas states as follows:

I. THE GUIDELINE CALCULATION

   a. The Base Offense Level

The PSR and the government calculate Mr. Rosas's offense level as 24 because he possessed the firearms after having two previous convictions for a controlled substance offense and a crime of violence. The PSR points to Mr. Rosas's convictions for possession of a controlled substance with intent to deliver identified in paragraph 39 of the PSR and a conviction for conspiracy to commit murder, identified in paragraph 36. Mr. Rosas objects to the use of

his conspiracy conviction as a qualify crime of violence, and asserts that his base offense level is 20. U.S.S.G. §2K2.1(a)(4)(A).

U.S.S.G. § 2K2.1 contains no independent definition of a crime of violence and instead directs the court to look to the Career Offender guideline (U.S.S.G. § 4B1.2(a)) to determine if an offense qualifies as a crime of violence. U.S.S.G. § 4B1.2(a) states:

> The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one years, that—
> (1) Has an element the use, attempted use, or threatened use of physical force against the person of another, or
> (2) Is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

The PSR notes that, "[p]ursuant to §4B1.2(a)(2) and Application Note 1 of §4B1.2, murder is an enumerated crime of violence and conspiracy to commit that offense is included as a crime of violence." (PSR at 14). While murder is indeed an enumerated crime of violence pursuant to §4B1.2(a)(2), only the application notes sweep inchoate crimes, like conspiracy, into the definition of a crime of violence. U.S.S.G. §4B1.2, App. N. 1.

After the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015), a "violent felony" under the Armed Career Criminal Act could only qualify as such if the elements of the offense include the use, attempted use, or threatened use of physical force against the person of another, or is one of the enumerated offenses. Courts are instructed to use

2

the categorical approach to determine if the predicate offense qualifies as a "violent felony" under 18 U.S.C. §924(e). *Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013); *United States v. Johnson*, 743 F.3d 1110, 1111 (7th Cir. 2014). This approach requires that courts "look only to the statutory definitions—i.e., the elements—of a defendant's [offense] and not to the particular facts underlying [the offense]" in determining whether the offense qualifies as a "violent felony." *Descamps*, 133 S. Ct. at 2283 (citation omitted); *Johnson*, 743 F.3d at 1111.

Despite having identical language as the Armed Career Criminal Act, *Beckles v. United States* prevented defendants from raising similar vagueness challenges to the residual clause contained in the text of the guidelines. *Beckles v. United States*, 137 S. Ct. 886, 892 (2017). After *Beckles*, litigation regarding the Career Offender's residual clause continued, however, this time focusing on the pre-*Booker* mandatory applications of the guidelines. In analyzing the question of whether inchoate offenses are predicate crimes of violence, the Seventh Circuit identified three different "varieties of text in the Guidelines: (1) the guidelines provision[s] [themselves], which are equivalent of legislative rules adopted by federal agencies and must be submitted to Congress for review and approval; (2) the Sentencing Commission's policy statements, which have as much the same effect as the Guidelines themselves; and (3) the Commission's commentary, which interprets the Guidelines and explains how they are to be applied."

3

*D'Antoni v. United States*, 916 F.3d 658, 663 (7th Cir. 2019), (quoting and citing *Stinson v. United States*, 508 U.S. 36, 41-42 (1993) (internal quotation marks omitted). Under *Stinson,* "application notes are interpretations of, and not additions to, the guidelines themselves, and an application note has no independent force. Consequently, the list of qualifying crimes in §4B1.2, application note 1 is enforceable only as an interpretation of the definition of the term 'crime of violence' in the guideline itself, and more specifically, as an interpretation of §4B1.2's residual clause." *D'Antoni v. United States*, 916 F.3d 658, 663 (7th Cir. 2019), (quoting and citing *Stinson v. United States*, 508 U.S. 36, 41-42 (1993) (internal quotation marks omitted).

In *United States v. Rollins,* the Seventh Circuit held that commentary in the Guidelines "has no legal force standing alone." *United States v. Rollins*, 836 F.3d 737, 742 (7th Cir. 2016). More importantly, once the residual clause is no longer available, "the application note's list of crimes is no longer interpreting any part of §4B1.2's definition of 'crime of violence'," and is therefore "*adding* to the definition. And that's *necessarily* inconsistent with the text of the guideline itself." *Id.*

By the time *Beckles* was decided, the United States Sentencing Commission eliminated the residual clause from the Career Offender guideline and replaced it with the enumerated offenses that were formerly listed in the application notes. However, inchoate offenses are not included in this new list of enumerated offense that are crimes of violence under the

4

Career Offender guideline, and are still only contained within the commentary. The offenses of aiding and abetting, conspiring, and attempting to commit crimes of violence are still a list of crimes that are not contained within the guideline itself and are thus *adding* to the definition, which is, according to *Rollins, necessarily inconsistent* with the text of the guideline itself.

The text of Application Note 1 regarding inchoate offenses has not changed since its first appearance in 1989, which is the same year that the residual clause became part of §4B1.2(1)(ii). *See* U.S.S.G. §4B1.2 Amend. 268 (Nov. 1, 1989). The residual clause and inchoate offense are inextricably intertwined, such that, without the residual clause, the inchoate offenses have no "mechanism or textual hook in the Guidelines that allows [the court] to import offenses not specifically listed therein into §4B1.2(a)'s definition of 'crime of violence'." *D'Antoni v. United States*, 916 F.3d 658, 663 (7th Circ. 2019)(quoting *United States v. Soto-Rivera*, 811 F.3d 53, 60 (1st Cir. 2016)).

Conspiracy to commit murder is not murder. To use the inchoate offense of conspiracy to commit murder as a predicate offense based on the application note alone not only improperly expands the definition of a crime of violence, but it adds offenses to the guidelines that have not been submitted to Congress for review and approval. It is clear that Illinois conspiracy does not satisfy the force clause, and the only way it can be included as a crime of violence is through reference to the application notes.

5

As such, Mr. Rosas's conviction for conspiracy to commit murder should not be counted as a crime of violence under 2K2.1(a)(2). The appropriate guideline to apply is §2K2.1(a)(3), and his base offense level is therefore 20.

### b. The Trafficking Enhancement under §2K2.1(b)(5).

Both the PSR and the government assert that Mr. Rosas should receive a four-level enhancement in his offense level pursuant to U.S.S.G. § 2K2.1(b)(5) because he "trafficked three firearms to a person who he believed to be a fellow gang member and whose receipt would be unlawful. (PSR at 17).

For the trafficking enhancement to apply, the government bears the burden of showing that either Mr. Rosas "knew or had reason to know" that he transferred the firearms to a person whose possession or receipt of the firearm would be unlawful, or that the recipient intended to use the firearms in a further crime. U.S.S.G. §2K2.1, App. Note 13(A). The PSR applies the enhancement based on the premise that Mr. Rosas transferred the firearm to a gang member whose receipt would be unlawful. (PSR at 17). The government's position is that the Mr. Rosas knew or had reason to know that the recipient of the firearms would commit a further crime.

Neither the government nor the PSR present any evidence that Mr. Rosas knew or had reason to know that the confidential informant was an "individual whose possession or receipt of the firearm would be unlawful." Under §2K2.1, Application Note 13(B), a prohibited individual is someone

6

who (i) has a prior conviction for a crime of violence, a controlled substance offense, or a misdemeanor crime of domestic violence; or (ii) at the time of the offense was under a criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." Being a "fellow gang member" is not the same as having the specific criminal history that would make the confidential informant's possession of the firearms unlawful for purposes of the trafficking enhancement. Neither the government nor the PSR have submitted evidence that Mr. Rosas knew or had reason to know that the confidential informant had any criminal history at all. The firearms transactions may given Mr. Rosas reason to believe that their purchase was unlawful, but not that the confidential source's use or possession of the firearms was unlawful. An unlawful *purchase* does not automatically place someone in the category of prohibited individuals governed by §2K2.1(b)(5). *United States v. Moody*, 915 F. 3d 425 (7th Cir. 2019).

Secondly, Mr. Rosas disagrees that he knew or had reason to know that the confidential informant would dispose of the firearm unlawfully. Mr. Rosas agrees with the PSR's conclusion that the recorded conversation between Mr. Rosas and the confidential informant "does not clearly indicate that the firearms would be used for retaliation." (PSR at 20). To start, according to the government's version of the offense, during the afternoon of March 18, 2015, the confidential informant arranged to purchase an ounce of

7

cocaine from Mr. Rosas in addition to the firearms he intended to purchase. Upon arriving at Mr. Rosas's location, the CI and Mr. Rosas had the following conversation:

> CS: I'll try to grab that right quick, cause they just, they just lit that n-----s crib up.
>
> Rosas: Who's that?
>
> CS: Huh?
>
> Rosas: Who?
>
> CS: Did uh, them hooks?
>
> Rosas (unintelligible)
>
> CS: Everyone Keep blowing me up, is that for the,
>
> Rosas: For this one.
>
> CS: It's all coming down. (on phone) Hey I'm gonna be down there right now, I'll be down over there right now, I'm on Ridgewood, I'll be over there right now though. Alright bye, alright bye. I'm telling you man, this shit's, it's going down , it's like a war zone.
>
> Rosas: (unintelligible)
>
> CS: And then um, I'm going to run this down, and then I'll shoot back, and then uh, I'll chill with you before you take off, chilling. Man those are, those are small, huh?
>
> Rosas: Yeah, it's short, this one is a long, for the uh,
>
> CS: It's like a starter gun, starting on the race, pow.
>
> Rosas: this one knock a chunk out of this.
>
> CS: You take uh, thirteen for everything?
>
> Rosas: uh, and a zone?

CS: well seven for the zone, and six for both the things, like I mean,

Rosas: yeah fuck it.

CS: And then I'm gonna shoot, so I'm go dump this off to these n------s and then I'm gonna shoot right back.

Rosas: You want all this right now?

***further in the conversation****

CS: Oh well fuck dude, I'm gonna, I'm, I just wanna, I just wanna drop this shit off in the neighborhood for these n------s right quick, cause they, they really need it. That's why I came over here right away, and then I'm gonna uh, do what I, do what I do, and that way we could just, man, we be straight.

Despite the Government's assertion to the contrary, the confidential informant never disclosed which individual's home had been shot at, nor who specifically he would be meeting with after leaving Mr. Rosas'. Nothing in the conversation indicates that Mr. Rosas knew specifically to whom the confidential informant was referring. Moreover, it's unclear from the conversation when the confidential informant is referring to dropping something off to other individuals, whether he is referring to the firearms or the ounce of cocaine he just purchased. At no point does the confidential informant refer to the items he is talking about with specificity. He repeatedly refers to a purchase involving both firearms and cocaine as "grab *that* right quick," "I'm going to run *this* down," I'm going to dump *this* off," and "I just wanna drop *this shit* off." Furthermore, even if the confidential informant is referring to providing other individuals with the firearms he

9

purchased, there is no discussion that suggests that these unnamed individuals intended to retaliate against whomever shot at them, and thus no evidence suggesting that Mr. Rosas's *knew* the firearms were being used for retaliation.

### c. Enhancement for Use of Firearm in Connection with another felony offense under §2K2.1(b)(6)(B)

Mr. Rosas agrees with the PSR's assessment that he is not subject to a four-level increase for using or possessing the firearms in connection with another felony offense under U.S.S.G. §2K2.1(b)(6)(B). The PSR references §2k2.1, Application Note 14(A), which states that enhancement applies if "the firearm….facilitated, or had the potential to facilitate another felony offense or another offense." The PSR further concluded that "the communications between the CS and the defendant on March 18 does not clearly indicate that the firearms would be used for retaliation." (PSR at 20).

*United States v. Jemison,* 237 F.3d 911 (7th Cir. 2001), cited by the government is distinguishable from the facts of this case in a significant way. In *Jemison,* the defendant specifically admitted that he intended to provide firearms to gang members. *Id.* at 218. Here, Mr. Rosas never made such an admission. The only statements indicating that Mr. Rosas knew or should have known that the firearms would facilitate another felony offense was the statement made by the CS that "I'll try to grab that right quick, cause they just, they just lit that n-----s crib up." The government proposes that this single statement gave Mr. Rosas reason to believe that (1) a specific

10

individual's home had been shot up, (2) that the shooting was a drive-by shooting, and (3) that the CS intended to give the firearms to Latin King members for the purpose of retaliation. As indicated by the full transcript included above, none of those conclusions can be drawn from the statements made by the CS. Regardless of what the government now alleges the CS intended to do with the firearms, his recorded statements do not support this conclusion. As such, the four-point enhancement under §2K2.1(b)(6)(B) should not apply.

### d. Obstruction of Justice.

Both the government and the PSR seek to enhance Mr. Rosas's sentence based on obstruction of justice. The enhancement is sought based on statements made to pretrial services that Mr. Rosas was undergoing chemotherapy treatment for cancer. (PSR at 10).

During the multi-day detention hearing, the government asserted that there was a s presumption to detain Mr. Rosas based on the potential 20-year sentence he faced because of the charged drug offense, thus shifting the burden to Mr. Rosas to rebut this presumption of detention. (Gov. Tr. 3/7/16 at 9). After Mr. Rosas's attorney indicated that he wished to present the court with Mr. Rosas's medical records, the government asserted that the medical records would assist the court in determining whether the MCC was capable of providing necessary medical treatment, but they still had concerns about agreeing to Mr. Rosas's release based on other grounds—namely his

11

connections to Mexico. (Gov. Tr. 3/11/16 at 4-5). In considering whether to proceed with the detention hearing without the medical records, the court noted,

> "Mr. Rosas's medical condition is only one of the issues or factors that affect whether he stays in custody or is released. And, you know, I would note that pretrial services made its recommendation of release on home confinement without all the I's dotted and T's crossed with respect to his medical condition based on his self-report. But they also looked at other things, such as his past criminal history, his—the stability of, you know, relationships he has, where he is living, all the rest of the stuff, which I think are also factors that we need to look at."

(Gov. Tr. 3/11/16 at 11-12).

In response, the government then argued,

> [Mr. Rosas] committed multiple crimes, multiple—he has multiple new arrests and multiple new convictions while on bond, while on parole for approximately six months when he started selling guns to a confidential source.
> There is a litany of reasons, *independent of what his medical issues are*, as to why he should be detained.

(Gov. Tr. 3/11/16 at 13)

The court then determined that the hearing would be continued to allow for the parties to review Mr. Rosas's medical records, as well as his criminal history records. (Gov. Tr. 3/11/16 at 17-18).

Before the detention hearing resumed, and before receiving Mr. Rosas's medical records, the government filed a Memorandum in Support of Continued Detention, which argued that Mr. Rosas should be detained based on :

(1) his likely a career offender status, (Doc. 23, at 4)
(2) that he had seven felony convictions, (Doc. 23, at 4-7)
(3) that his convictions were for violent crimes, (Doc. 23, at 7)

(4) that he admitted to daily drug use and tested positive for cannabinoids two days after his arrest, (Doc. 23 at 8)
(5) had three trips to Mexico and traveled there without a passport, and (Doc. 23 at 8)
(6) he was a life-long member of the Latin Kings. (Doc. 23 at 8).

The government then went on to state that Mr. Rosas's medical condition was only one factor to consider under the Bail Reform Act, and that "even if defendant produced such medical records related to his medical condition, they cannot rebut the presumption here and defendant still remains a risk of nonappearance and danger to the community." (Doc. 23 at 9). The government clearly did not think Mr. Rosas's medical condition was "material" to the bond determination when it filed their Memorandum in support of Mr. Rosas's continued detention without having reviewed those records.

When the detention hearing resumed on April 5, 2016, the court had received a letter from the MCC that Mr. Rosas's cancer was in remission. The hearing was then continued a final time for the court's ruling.

On April 11, 2016, Magistrate Judge Gilbert entered a detention order agreeing with the government that Mr. Rosas had not rebutted the presumption of detention and listed the following reasons for detention: (i) lack of stable employment, (ii) prior criminal history, (iii) lack of significant community or family ties in the Northern District of Illinois, (iv) existence of significant family or other ties outside of the United States, (v) history of alcohol or substance abuse, (vi) prior failure to appear in court as ordered,

(vii) facing length period of incarceration if convicted, (viii) weight of evidence against the defendant is strong, (ix) history of violence or use of weapons, (x) engaged in criminal activity while on probation, parole, or supervision, (xi) defendant's three trips to Mexico and reentry to the United States without inspection (the court found Mr. Rosas's statement about his ability to enter the United States without inspection not credible, particularly in light of his misrepresentations concerning his medical condition), and (xii) the lack of information about Mr. Rosas's spinal condition and whether he could receive treatment for that condition while in custody. (Doc. 32).

The obstruction of justice enhancement under U.S.S.G §3C1.1 applies when a defendant "(1) willfully obstructed or attempt to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." Application note 4(F) and (H) provide examples of covered conduct cited by both the PSR and the government: (F) providing materially false information to a judge or magistrate judge, and (H) providing materially false information to a probation officer in respect to a presentence or other investigation for the court. U.S.S.G. §3C1.1, App. Note 4. The application notes further go on to define "material" as, "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." *Id.* at App. Note 6.

An enhancement for obstruction of justice "does not apply to any and all obstructive conduct that a defendant may have attempted or committed." *United States v. Polland,* 994 F.2d 1262, 1269 (7th Cir. 1993). As propounded by the government, Mr. Rosas's misrepresentation about his current cancer status was material to the court's bond determination because the court held multiple days of hearings in order to determine the current state of Mr. Rosas's health. However, as illustrated by the detention order, the court identified eleven separate reasons for detaining Mr. Rosas. Importantly, the misrepresentation of his medical condition was not cited as an independent basis to detain Mr. Rosas, and was instead included as a reason why the court was incredulous about Mr. Rosas's reentry into the United States using only his Illinois driver's license. Further, during the detention hearing, the court meticulous detailed the reasons for denying Mr. Rosas's release. While the court noted the fact that Mr. Rosas's statement to pretrial services was not true, the court was more concerned about how this untruth reflected on the legitimacy of his other statements about crossing the border from Mexico. (Tr. 4/8/2016 at 17). The court then went on to discuss Mr. Rosas's "long history of not following the rules," identifying his possession of drugs while in jail, new offenses while on parole, convictions while on bond, and crossing the border without a passport—all of which indicated to the court that Mr. Rosas would not comply with conditions of release. (Tr. 4/8/2016 at 17-18).

Ultimately, while Mr. Rosas's statement's about his cancer diagnosis was not true, the statements were not material to the court's determination about Mr. Rosas' continued detention. The court identified multiple factors that affected its determination and those factors did not specifically include Mr. Rosas's false statement about his cancer status.

Further, because Mr. Rosas's false statement did not affect his guilt or innocence, these false statements should not be used as a basis for denying his acceptance of responsibility. Acceptance of responsibility is aimed at admitting criminal conduct that is part of the offense or relevant conduct. Even if this Court applies the obstruction of justice enhancement, the false statements that are the subject of the enhancement have nothing to do with Mr. Rosas's criminal culpability in this case and do not amount to a denial of that criminal culpability. Mr. Rosas agrees with the PSR's determination that he is entitled to the three-point reduction for acceptance of responsibility.

e. **The adjusted offense level**

In summary, it is Mr. Rosas's position that his base offense level is 20 pursuant to §2K2.1(a)(4)(A). His offense level is enhanced by 2 levels pursuant to §2K2.1(b)(1)(A) because the offense involved three firearms. With a three-level reduction for acceptance of responsibility, Mr. Rosas's total offense level is 19.

Mr. Rosas agrees with the PSR's assessment of nine criminal history points, placing him in Criminal History Category IV. The resulting guideline range is therefore 46-57 months.

## II. THE 3553(a) FACTORS

Despite the untruths about his current cancer status during the detention hearing, what is clear is that Mr. Rosas is unwell. Mr. Rosas did, indeed, have testicular cancer, the same cancer that killed his father, while his father was incarcerated. To say that Mr. Rosas is afraid of following in his father's footsteps is a gross understatement. The PSR notes that Mr. Rosas reported he is "fears 'dying in [his] sleep." (PSR at 77). He has also suffered through a stabbing, a gunshot wound, being pushed through a glass window, falling off of a motorcycle, a car crash, and injuring his spine, head, neck, shoulder, hip, and knee after falling from his bunk at the MCC. (PSR at 70-73) Mr. Rosas has spent the last few years attending court either with the assistance of a walker or using a wheel chair. His small frame, coupled with his combined illnesses make him vulnerable to abuse from other inmates.

Most significantly, his combined illnesses make him particularly susceptible to suffering the worst effects of COVID-19 should he contract it while in custody. People with history of cancer, even with cancer in remission, are more likely to suffer the worst effects of COVID-19 compared

to individuals with no cancer history.[1]  Furthermore, as noted in the PSR, Mr. Rosas also has high blood pressure. (PSR at 74). Studies have shown that individuals with high blood pressure are also at increased risk of suffering severe complications from COVID-19.[2] While the mortality rate from COVID-19 among the general population is at 2% currently, the mortality rate for those with hypertension (high blood pressure) is 6%.[3] While Mr. Rosas previously feared dying in prison from a recurrence of his cancer, he also now worries about contracting COVID-19 and the effects that infection would have on his health as well.

At 44 years old, Mr. Rosas realizes he has very little to show for the choices he has made.  He has lost relationships with his daughter and much of his family.  He worries about homelessness upon his release, his ability to work, and his continuing health problems.  He has, however, taken advantage of programs while incarcerated as indicated by the attached certificates.  He also previously earned his GED while in custody and went on to earn an associates degree in computer technology, and hopes to complete an engineering degree in the future. (PSR at 82).

---

[1] Landman, Allison, et al.  Cancer Patients in SARS-CoV-2 infection: a nationwide study in China, Lancet, Feb 14, 2020, Available at https://www.thelancet.com/pdfs/journals/lanonc/PIIS1470-2045(20)30096-6.pdf (Last visited Oct 13, 2020)

[2] American College Of Cardiology, COVID-19 Clinical Guidance For the Cardiovascular Care Team. March 6, 2020 Available at: https://www.acc.org/~/media/Non-Clinical/Files-PDFs-Excel-MS-Word-etc/2020/02/S20028-ACC-Clinical-Bulletin-Coronavirus.pdf  (last visited Oct 13, 2020)

[3] Id.

III. **CONCLUSION**

For the foregoing reasons, GABRIEL ROSAS respectfully submits that s sentence of time served (which equals 55 months since the date of his arrest on February 24, 2016, is sufficient, but not greater than necessary to satisfy the purposes of sentencing.

Respectfully submitted,

S/ Quinn A. Michaelis

Quinn A. Michaelis
Attorney for GABRIEL ROSAS
73 W. Monroe, Suite 106
Chicago, IL 60603
(312)714-6920

**CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2020, I electronically filed the above

GABRIEL ROSAS'S  SENTENCING MEMORANDUM

with the Clerk of Court using the CM/ECF system to all listed parties in the case.

Respectfully Submitted on October 14, 2020


By His Attorney,

s/ Quinn A. Michaelis

Quinn A. Michaelis
Attorney For Gabriel Rosas
73 W. Monroe
Suite 106
Chicago, Illinois 60603
312-714-6920