UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>GABRIEL ROSAS | No. 16 CR 107<br><br>Hon. Andrea Wood |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
FOR COMPASSIONATE RELEASE**

The UNITED STATES OF AMERICA, through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby responds to defendant Gabriel Rosas's *pro se* motion for compassionate release. R. 190. For the reasons set forth below, the government respectfully submits that defendant's motion should be denied.

**FACTUAL BACKGROUND**

**I.     Offense Conduct**

Beginning in or around July 2014, ATF began investigating a faction of the Latin Kings street gang based in Joliet, Illinois. According to information gathered during the investigation, Rosas was then a member of the Joliet faction of the Latin Kings and involved in the sale of firearms and narcotics. Over the course of the investigation, a confidential source working with law enforcement (hereinafter, "CS") purchased three firearms and a quantity of cocaine from ROSAS during two

controlled transactions, which occurred on December 31, 2014 (firearm transaction), and March 18, 2015 (two firearms and cocaine transaction).

   A. <u>December 31, 2014, sale of a firearm by ROSAS to the CS (Count One)</u>

   On or about December 20, 2014, the CS unexpectedly ran into ROSAS and he told the CS that he (ROSAS) had three 9mm firearms for sale. On or about December 21, 2014, at the direction of agents, the CS sent a text message to ROSAS, which stated: "it's me [the CS]... was checking about those things [firearms] we talked about... I'm on it brother..." About one minute later, ROSAS responded, "K." On or about December 30, 2014, the CS met ROSAS again, at which time ROSAS told the CS that he (ROSAS) still had a 9mm firearm for sale for $400. The CS agreed to buy the firearm the next day.

   On or about December 31, 2014, at approximately 10:30 a.m., the CS sent a text message to ROSAS, which read: "Yeah 4sure at 5 I got to visit with my grandma after that so if we can do it sooner that will be cool too ... I got the loot..." Later that afternoon in a telephone call, ROSAS stated he was "waiting on my dude [source] to get out of work." ROSAS instructed the CS to wait until ROSAS called the CS. Approximately an hour and half later, the CS called ROSAS and the CS stated, "what's the business," and ROSAS responded that the CS could come over "through and chill" and "he'll [source of firearm] be here," meaning the CS could come to where ROSAS was and wait for the source to bring the firearm.

At approximately 4:45 p.m., the CS met with agents at a predetermined meeting location, where they searched the CS and the CS's vehicle, equipped the CS's person with an audio-video recording device, and provided the CS with $400 in pre-recorded United States currency. Agents then surveilled the CS as he/she drove to ROSAS's residence at 1105 Elgin Avenue in Joliet, Illinois, and, upon arriving there at approximately 5:07 p.m., agents observed as the CS walked to the rear of the residence.

Inside the basement apartment was ROSAS and two other persons smoking marijuana. The CS sat down in a chair and waited for ROSAS's source to arrive. At approximately 5:16 p.m., agents observed a white car arrive at ROSAS's residence. About the same time, a person entered the basement apartment and handed a nylon lunch bag to ROSAS and stated words to the effect of whether they were going to "step out," meaning go into another room to complete the transaction. ROSAS and the CS then stood up and walked to another room. Shortly thereafter, the audio-video recording then captured the sound of a Velcro bag being opened, and ROSAS showed the CS the 9mm firearm. The CS stated words to the effect of, "that mother fucker's decent," referring to the firearm, and ROSAS agreed. ROSAS then showed the CS a box of 9mm ammunition, but told the CS that he could not give the box to the CS. ROSAS then found a sock and poured the ammunition into the sock, which ROSAS gave to the CS. The CS counted out $400, and handed it to ROSAS. ROSAS advised the CS "to be careful out there."

3

At approximately 5:19 p.m., agents observed the CS walk from the rear of ROSAS's residence, enter his/her car, and drive to a predetermined meeting location. There, the CS gave agents a dark-colored lunch bag. Inside the bag, agents seized a 9mm, Bryco Arms, Model – Jennings Nine, bearing serial number 136207, wrapped in a green washcloth, and a sock containing 50 rounds of 9mm ammunition. Agents searched the CS and the CS's vehicle for an additional contraband, with negative results.

B. <u>March 18, 2015, sale of two firearms and a quantity of cocaine by ROSAS to the CS (Counts Two and Three)</u>

On or about March 16, 2015, the CS reported to ATF that, on a prior occasion, the CS ran into ROSAS unexpectedly in the Joliet area and ROSAS indicated to the CS that he had firearms for sale. On or about March 17, 2015, the CS and ROSAS exchanged calls/text messages in an attempt to negotiate the purchase of the firearms. At approximately 7:33 p.m. that day, the CS sent a text message to ROSAS, stating, "Hey it's [the CS], this is my other line – gonna call in a min." ROSAS responded, "K." At approximately 7:41 p.m., the CS and ROSAS spoke, and the CS asked if they could "do that tomorrow as soon as I can get back," referring to the CS purchasing the firearms. ROSAS stated, "Yeah we can do that tomorrow, cause I have to have somebody bring them [the firearms] to me." ROSAS asked the CS what time tomorrow, so ROSAS could "make sure I got everything on, right there," referring to having the firearms at his residence ready for sale. The CS and ROSAS agreed to

4

conduct the transaction between 6:00 p.m. and 8:00 p.m. the following day, that is, March 18, 2015. The CS asked: "So they're both the same thing," meaning whether both firearms were the same caliber. ROSAS confirmed, "Yeah, they're both the same thing. The one with the three, that's a, it's a 22 long. Just a [unintelligible] it got three of those things with it, and then the other one is a, a revolver." The CS understood ROSAS to mean that both firearms were .22 calibers, while one .22 caliber had three magazines with it and the other .22 caliber was a revolver. The CS then asked, "All together, like what 650 for both [$650 for both firearms]?" ROSAS agreed, and asked if the transaction was "a for sure thing, so I can have 'em ready." The CS responded it will be "a for sure thing." The CS and ROSAS agreed to conduct the transaction on March 18, 2015.

On March 18, 2015, the CS informed agents that, earlier that day, the CS spoke to ROSAS and ROSAS confirmed the transaction would occur later that evening. The CS also asked ROSAS if the CS could purchase a "zone," referring to an ounce of cocaine from ROSAS. ROSAS stated that would be okay. At approximately 4:46 p.m. that day, the CS and ROSAS spoke again, the CS stated that he/she was about two hours away and asked, "Everything is still all good, right?" ROSAS replied "Yeah." The CS asked ROSAS if he would "have that other thing ready for me too," referring to the ounce of cocaine. ROSAS replied "Yep." ROSAS asked what time the CS would be around to do conduct the transaction. The CS responded: "About 8 o'clock."

5

At approximately 8:15 p.m., the CS met with agents at a predetermined meeting location. At approximately 8:30 p.m., the CS called ROSAS, who asked the CS, "You ready?" The CS stated he/she was "getting the money together now" and asked how much "you want for that one thing [the ounce of cocaine]?" ROSAS responded: "I got both of them on deck right now for the 650 [$650 for the two firearms]." The CS clarified, "No, I'm talking about the other one [the ounce of cocaine]." ROSAS stated "Which one?" The CS replied, "The zone [the ounce of cocaine]." ROSAS stated "Oh, for the seven [$700]." The CS asked ROSAS if the CS "grabbed the zone, do you think you could a, knock fifty bucks off the other one, an even six?," referring to ROSAS taking $50 dollars off the price of the firearms if the CS also purchased the ounce of cocaine for $700. ROSAS replied, "Just come holler at me." The CS stated that he/she would be over in approximately 10 minutes.

After the call with ROSAS, the agents searched the CS and the CS's vehicle for contraband, with negative results. The agents gave $1,300 to the CS in pre-recorded United States currency. The agents equipped the CS's person with audio-video recording equipment, and surveilled the CS as he/she drove to ROSAS's residence at 1105 Elgin Avenue in Joliet, Illinois. At approximately 8:45 p.m., agents observed the CS arrive at ROSAS's residence, park, exit his/her vehicle and walk to the rear of the residence towards the basement apartment.

Inside the basement apartment was ROSAS and three other subjects. There was a large chunk of suspect cocaine on the table inside the apartment. The CS told

6

ROSAS that the CS was trying to "grab that [firearm] right quick, cause they just, they just lit this n-----'s crib up," referring to why the CS needed the firearm quickly and the CS's purported plan to give the firearm to fellow Latin King gang member Individual A, whose residence was shot at in a drive-by shooting by Vice Lord gang members. ROSAS asked the CS who did the shooting, and the CS replied, "them Hooks [Vice Lords street gang]," a rival of the Latin Kings. The CS told ROSAS, "That shit's going down. It's like a war zone," referring to the ongoing battle between the Latin Kings and Vice Lords. ROSAS then showed the CS a nylon case containing two extra magazines for the semi-automatic firearm. ROSAS removed the two firearms from two socks. The CS told ROSAS that he/she was going to "run this down and then I'll, I'll shoot [come] back," referring to giving the firearms to Latin King gang members to be used in retaliation for the drive-by shooting. ROSAS showed the firearms to the CS, and the CS stated, "Those [firearms] are small." ROSAS stated, "Yeah, this is a short [referring to the revolver], this one's a long [referring to the semi-automatic firearm but the firearm itself stated .22 long rifle on it]." The CS asked ROSAS if he would take "13 [$1,300] for everything [the two firearms and the ounce of cocaine]." ROSAS asked "and a zone [ounce of cocaine]?" The CS clarified: "Seven [$700] for the zone [ounce of cocaine] and six [$600] for both the things [two firearms]." ROSAS agreed: "Yeah, fuck it." ROSAS then went to the table and placed some cocaine into a plastic bag; ROSAS weighed the cocaine and then handed it to the CS. The CS told ROSAS that the CS was going to drop the guns off in the

7

"neighborhood" and "because they they really need it," referring to the Latin Kings needing the guns to use against the Vice Lords. The CS asked ROSAS, "They're not loaded, right?" ROSAS replied, "The automatic is, automatic got the clip in it already." The CS then handed ROSAS $1,300, and as the CS did so, the CS stated, "That's thirteen [$1,300]." The CS asked for a bag to put the two firearms and the ounce of cocaine into. ROSAS gave the CS a paper shopping bag, and the CS placed all the items in the shopping bag and exited the apartment.

During the transactions, the video recording affixed to the CS captured a clear view of ROSAS's face, as shown below:



At approximately 8:52 p.m., surveillance agents observed the CS walk from the rear of ROSAS's residence and enter the CS's vehicle. Law enforcement conducted surveillance as the CS drove to the predetermined meeting location. At approximately

8

8:59 p.m., law enforcement met the CS at the predetermined meeting location. Agents recovered a shopping bag from the floorboard of the CS's vehicle; inside the bag was two firearms, specifically: (1) a Phoenix Arms pistol, model HP22A, .22 caliber, bearing serial number 4406046, loaded with 10 rounds of .22 caliber ammunition, wrapped in a black sock; and (2) a Rohm .22 caliber revolver, bearing serial number 1047115, wrapped in a white and pink sock. Also recovered from the bag was (1) a nylon dual-magazine pouch with two .22 caliber magazines with 9 and 10 rounds of .22 caliber ammunition in each magazine, respectively; (2) five rounds of .22 caliber ammunition in the same white and pink sock that contained the Rohm revolver; and (3) a small plastic bag containing approximately 29 grams of a white chunky substance, which tested positive as cocaine. The agents subsequently searched the CS and the CS's vehicle for additional contraband, with negative results.

C. Arrest of ROSAS and post-arrest interview

On February 24, 2016, at approximately 6:00 a.m., ATF arrived at 1105 Elgin Avenue in Joliet, Illinois, in order to arrest ROSAS. Agents entered the residence and conducted a security sweep of the residence and located ROSAS and his girlfriend in the basement, where the above transactions occurred. Agents found ROSAS dumping a small electronic scale and an unknown quantity of a green leafy substance—suspect marijuana—into a toilet in the basement. ROSAS was placed into custody and transported to the Joliet Police Department without further incident. Because the

suspect marijuana was waterlogged and mostly dissolved, ATF disposed of these items on scene. At the station, agents interviewed ROSAS, and portions of the interview were video-recorded.

## II.        Procedural History

### A. District Court case

On or about February 23, 2016, a criminal complaint was filed against Gabriel Rosas, charging him with felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1), and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1). R. 1. On March 24, 2016, a grand jury sitting in the Northern District of Illinois returned an indictment, charging Rosas with possession of a firearm by a convicted felon (Counts One and Two) and distribution of a controlled substance (Count Three). R. 15. On November 6, 2019, a grand jury sitting in the Northern District of Illinois returned a superseding indictment, charging Rosas with the same counts as alleged in the indictment but addressing a change in the law as a result of *Rehaif v. United States*, 139 S. Ct 1291 (2019). R. 135. On January 30, 2020, Rosas entered a negotiated plea of guilty to Counts One and Two (both violations of 18 U.S.C. § 922(g)(1)) in the superseding indictment. R. 154.

On October 23, 2020, the district court held a sentencing hearing and sentenced the defendant to a 78-month term of imprisonment, concurrent as to

Counts One and Two. R. 180. On November 4, 2020, the defendant filed a notice of appeal. R. 184.

According to the BOP, defendant is currently incarcerated at FCI-Pekin and is scheduled to be released on October 4, 2021.[1]

B. Defendant's Instant Motion for Compassionate Release

On or about January 19, 2021, the defendant filed "Defendant's Motion for Compassionate Release and/or Reduction in Sentence." R. 190. In the motion, the defendant asserted that he suffered from an "extensive history of medical issues" and had only nine until his projected release date. With respect to his medical issues, the defendant claimed that he had recently tested positive for tuberculosis, and further reported that he previously suffered from cancer. R. 190, at 2-3. As a result of his past ailments, the defendant claimed to have a "compromised immune system." R. 190, at 3. The defendant argued that persons with "less medical issues, more time remaining on their sentence, and more serious offenses than [him]" have been released, but the defendant did not provide any specific information. R. 190, at 4.

III. **The BOP's Response to COVID-19**

As reported on the BOP's website, in January 2020, the BOP began a course of action to respond to the spread of COVID-19.[2]  Phase One of this course of action

---

[1] *See* BOP Inmate Locator (www.bop.gov/inmateloc) (last visited Feb. 12, 2021).

[2] Federal Bureau of Prisons COVID-19 Action Plan, March 13, 2020, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited Feb. 12, 2021).

included the creation of an agency task force working in conjunction with subject matter experts from the Center for Disease Control and Prevention ("CDC") and the World Health Organization to review guidance about best practices to mitigate transmission. *Id.* On March 13, 2020, as part of Phase Two of the course of action, the BOP began implementing various measures to mitigate the spread of the virus. These measures included suspending social visits, in-person legal visits, all inmate movement, and staff travel. The BOP also began implementing procedures to quarantine and screen inmates and staff for the virus, which included screening all newly arriving inmates for exposure risk factors and symptoms, quarantining asymptomatic inmates with exposure risk factors, and isolating and testing symptomatic inmates with exposure risk factors. *Id.*

Subsequent phases of the BOP's response included the authorization of inmate movement in order to avoid overcrowding at BOP facilities. However, such movements were limited to inmates who had been in custody for more than fourteen days and who had been subjected to exit screening to ensure that the prisoner had no COVID-19 symptoms (fever, cough, shortness of breath) and a temperature less than 100.4 F.[3] Subsequent phases of the course of action included the quarantine and isolation of all new inmates with asymptomatic inmates being quarantined for

---

[3] Updates to BOP COVID-19 Action Plan, March 19, 2020, https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited Feb. 12, 2021).

fourteen days and symptomatic inmates being isolated until testing negative for COVID-19, modifying operations to maximize social distancing, the maximization of telework for staff members, and conducting inventory reviews of all cleaning and medical supplies to ensure ample supplies were on hand and ready to be distributed as necessary at BOP facilities.[4]

On April 1, 2020, as part of Phase 5 of its COVID-19 action plan, the BOP secured all inmates to their assigned cells or quarters to decrease the spread of the virus.[5] On April 13, 2020, as part of Phase 6 of its COVID-19 action plan, the BOP continued to secure all inmates to their assigned cells or quarters to decrease the spread of the virus.[6] Thereafter, on May 18, 2020, the BOP extended the implementation of Phase 7 of its COVID-19 plan until June 30, 2020.[7] Phase 7 extends all measures from Phase 6, including measures to contain movement and decrease the spread of the virus.

[4] Bureau of Prisons Update on COVID-19, March 24, 2020, https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (last visited Feb. 12, 2021).

[5] COVID-19 Action Plan: Phase Five, March 31, 2020, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Feb. 12, 2021).

[6] COVID-19 Action Plan: Phase Six, April 13, 2020, https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (last visited Feb. 12, 2021).

[7] Bureau of Prisons COVID-19 Action Plan: Phase Seven, May 20 2020, https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp (last visited Feb. 12, 2021).

On August 5, 2020, the BOP announced Phase 9 of its COVID-19 plan, which extended its previous safety measures through and including August 31, 2020.[8] On September 2, 2020, the BOP announced that non-contact, socially distanced in-person social visitations would re-commence at certain BOP facilities.[9] Phase 9 continues to be in effect, with modifications updated on November 25, 2020, including the continuation of non-contact, socially distanced in-person visitations, where possible while maintaining the safety of our staff, inmates, visitors, and communities.[10]

Further details and updates of the BOP's modified operations are available to the public on the agency's website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp (last visited Feb. 12, 2021).

## ARGUMENT

### I.   Legal Standard

As amended by Section 603(b) of the First Step Act of 2018, Pub. L. 115-391, Title 18, United States Code, Section 3582(c)(1)(A) provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the

---

[8] Federal Bureau of Prisons, "Coronavirus (COVID-19) Phase Nine Action Plan," August 5, 2020, https://prisonology.com/wp-content/uploads/2020/08/COVID-19-Phase-9-COVID-Action-Plan.pdf (last visited Feb. 12, 2021).

[9] Bureau to Resume Social Visitation, September 30, 2020, https://www.bop.gov/resources/news/20200902_visitation.jsp#:~:text=(BOP)%20%2D%20The%20BOP%20recognizes,inmates%20were%20afforded%20500%20(vs. (last visited Feb. 12, 2021).

[10] BOP Modified Operations, Updated November 25, 2020, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Feb. 12, 2021).

14

receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)    extraordinary and compelling reasons warrant such a reduction; or

(ii)   the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Direct of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Under this statute, in addition to finding "extraordinary and compelling" reasons for the reduction, the Court must find that a sentence reduction is consistent with applicable policy statements issued by the U.S. Sentencing Commission and the sentencing factors set forth in 18 U.S.C. § 3553(a).

## II.    Defendant Has Not Complied With § 3582(c)(1)'s Requirement That He Exhaust His Administrative Remedies.

### A.    Defendant Did Not Seek a Sentence-Reduction from the BOP for Reasons Related to COVID-19

As stated above, according to 18 U.S.C. § 3582(c)(1), a defendant is free to bring a motion for compassionate release after he has exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's

behalf, or 30 days have elapsed since the receipt of such a request by the warden of the defendant's facility, whichever is earlier.

Here, based on the information available to the government, the defendant has *not* submitted a request for a sentence reduction to the BOP. In point of fact, the defendant does not even claim that he has complied with the administrative exhaustion requirements, nor did he attach any evidence to demonstrate the same. The defendant has, therefore, not satisfied § 3582(c)(1)'s requirement that he exhaust all administrative remedies. The defendant's motion should be denied for this reason alone.

## B. Exhaustion of Administrative Remedies is Mandatory.

When Congress enacted Section 603 of the First Step Act, it included an exhaustion requirement to ensure that BOP officials would have the first opportunity to review and consider a defendant's request for a sentence reduction or compassionate release. Congress demonstrated its intent that the BOP be given a minimum of 30 days to review an inmate's request before the issue is brought to court, by permitting inmates to pursue relief from the court only after the completion of the administrative appeal process or, at a minimum, 30 days after the warden's receipt of the inmate's administrative request. 18 U.S.C. § 3582(c)(1)(A). Enforcement of the statute's exhaustion requirement is mandatory, and may not be waived by courts. *United States v. Sanford*, No. 20-2445, 2021 WL 36622 (7th Cir. Jan. 25, 2021)

16

(holding that § 3582(c)(1)(A)'s exhaustion requirement is a mandatory claim-processing rule and that must be enforced when properly invoked).

Because defendant has not submitted an administrative request for a sentence reduction on the grounds presented in the instant motion, and therefore has deprived the BOP of the statutorily required opportunity to consider his request, this Court lacks authority to grant defendant any relief.

### III. Defendant Has Not Established "Extraordinary and Compelling Reasons" for Consideration of a Sentence Reduction.

Defendant seeks release pursuant to § 3582(c)(1)(A), which allows for such relief where, "after considering the factors set forth in section 3553(a) . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

Pursuant to Congress's directive, prior to the enactment of the First Step Act, the Sentencing Commission promulgated USSG § 1B1.13, which sets forth the Sentencing Commission's policy statement with respect to § 3582(c)(1)(A). Consistent with § 3852(c)(1)(A)(i), § 1B1.13 provides that a court may reduce a term of imprisonment, after considering the § 3553(a) factors, if three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction"; (2) "[t]he defendant is not a danger to the safety of any other person or to the community, as

17

provided in 18 U.S.C. § 3142(g)"; and (3) the reduction is consistent with the factors set forth in 18 U.S.C. § 3553, to the extent relevant. U.S.S.G. § 1B1.13.

As Congress expressly directed, the Sentencing Commission issued policy statements defining the "extraordinary and compelling reasons" that might warrant a sentence reduction under § 3582(c)(1)(A)(i). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of Title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."); *United States v. Saldana*, 807 F. App'x 816, 819 (10th Cir. 2020).

Application Note 1 to Guideline § 1B1.13 limited the "extraordinary and compelling reasons" for which a sentence reduction is appropriate to the following particular circumstances:

> 1.    The defendant suffers from a "terminal illness" or his physical or mental condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13 cmt. n.1(A).

> 2.    The defendant is at least 65 years old, experiencing a serious deterioration in physical or mental health because of the aging process, and has served the lesser of 10 years or 75% of his sentence. *Id.* § 1B1.13 cmt. n.1(B).

> 3.    The defendant's family circumstances include either the death or incapacitation of the caregiver of the defendant's minor child or minor

children or the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner. *Id.* § 1B1.13 cmt. n.1(C).

4.    "As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1B1.13 cmt. n.1(D).

Guideline § 1B1.13, cmt. n. 1.g

In *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020), the Seventh Circuit recently held that, because Guideline § 1B1.13 has not been amended following the enactment of the First Step Act, "the Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release." *Id.* at *2. Therefore, *Gunn* held, district courts are free to consider motions for a sentence reduction on grounds other than the categories of extraordinary and compelling reasons listed in Guideline § 1B1.13, as limited by the statute itself. However, the court pointed out:

> [t]he substantive aspects of the Sentencing Commission's analysis in §1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused.

*Id.* Under *Gunn*, Guideline § 1B1.13 remains instructive, although not exhaustive, in determining the meaning of the term "extraordinary and compelling reasons" for

19

purposes of § 3582(c)(1)(A)(i).[11]

In the present case, defendant asserts that he has demonstrated "extraordinary and compelling reasons" based on the COVID-19 pandemic and a number of medical conditions—specifically, tuberculosis, a history of cancer, and high blood pressure. R. 190, at 3. While the defendant has suffered from a myriad of health problems in the past, which enjoys support in his medical records,[12] none of these conditions place him at a higher risk of severe illness from the virus that causes COVID-19, per the CDC. First, the defendant's records confirm his tuberculosis "skin test" diagnosis, but tuberculosis is not one of the underlying medical conditions flagged by the CDC that makes a person of any age at increased risk of severe illness from the virus that causes COVID-19.[13] *But see United States v. Atwi*, 455 F. Supp. 3d 426, 432 (E.D. Mich. 2020) (providing that, "in light of Atwi's TB diagnosis and the serious dangers caused by the spread of COVID-19 in prison facilities, Atwi has met his burden of demonstrating that compelling and extraordinary reasons justify

---

[11] The government argued in *Gunn* and in numerous other cases that Guideline § 1B1.13 is binding on the district court in the context of motions for compassionate release filed by the defendant, and that the court lacks authority to grant relief under the statute on bases other than those enumerated in the application notes that accompany § 1B1.13. This argument is now foreclosed by *Gunn*. The government preserves for potential further review the argument that *Gunn* was wrongly decided, and that a sentence reduction may be granted under § 3582(c)(1)(A)(i) only where the defendant has established an extraordinary and compelling reason, as defined by Application Notes 1(A) through 1(C) to Guideline § 1B1.13.

[12] The government will submit to the Court a copy of the defendant's medical records.

[13] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Feb. 12, 2021).

compassionate release").[14] Furthermore, per the CDC, "*TB patients who are at least 65 years old*; have respiratory compromise from their TB; or other medical conditions, including HIV and other immunocompromising conditions, are at greater risk for severe COVID-19 infection."[15] The defendant is 45 years old, and it is not clear from the defendant's records that he falls within these other categories, for example, respiratory compromise from TB. In fact, the defendant's records would suggest otherwise. *See* Exhibit A, at 1 (noting the defendant's respiratory system as within normal limits and no evidence or complaint of cough). Second, while the defendant has a past history of cancer, according to the CDC, "[a]t this time, it is not known whether having a history of cancer increases your risk."[16] Third, as to the defendant's high blood pressure, the CDC has indicated that persons suffering from high blood pressure "*might* be at an increased risk for severe illness from the virus that causes COVID-19."[17]

---

[14] *Atwi* is distinguishable from the instant case. First, *Atwi* was decided in April 2020, at the start of the pandemic, and it is unclear whether the CDC guidance noted here by the government was available when the district court decided Atwi's motion. Second, *Atwi* was convicted of a non-violent offense – food stamp fraud and filing false tax return – and received a sentence of four months. *Id*. at 427.

[15] *See* https://www.cdc.gov/tb/education/public-health-emergencies.htm?s_cid=fb_cdctb_covid19202007120001 (last visited Feb. 12, 2021).

[16] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#cancer (last visited Feb. 12, 2021).

[17] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions (Feb. 12, 2021).

While the government acknowledges the defendant's past health problems, as confirmed by BOP records, the defendant does not currently present with medical conditions identified by the CDC as COVID-19 risk factors, and therefore, the defendant has not established that he suffers from "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).[18]

## IV. Defendant's Release Would Not Be Consistent with the Statutory Factors Set Forth in § 3553(a).

Even assuming arguendo that the defendant has established the existence of extraordinary and compelling reasons warranting consideration of a sentence reduction, this fact does not complete the relevant inquiry. This Court must also consider whether defendant poses a danger to the community and whether his release would be consistent with the factors set forth in 18 U.S.C. § 3553(a).

---

[18] Defendant also argues that his fear of being exposed to, or contracting, COVID 19, while in BOP custody also constitutes an extraordinary and compelling reason warranting release. While the government recognizes inmates' legitimate concern regarding the risk of infection, that concern does not amount to an extraordinary and compelling reason for release when evaluated under the statute, as well as the Sentencing Commission's policy statement set forth at Guideline § 1B1.13 and the accompanying application notes. Neither the statute nor the policy statement supports the notion that a generalized fear of future illness, even during a pandemic, constitutes an "extraordinary and compelling reason" warranting relief. *See, e.g.*, *United States v. Allegra*, Case No. 15 CR 243, Dkt. No. 232 (N.D. Ill. Apr. 13, 2020) ("General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. § 1B1.13.") (quoting *United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. March 25, 2020)). In fact, the defendant recently tested negative for COVID-19 on January 14, 2021. Exhibit A, at 5.

Here, several factors strongly weigh against compassionate release for defendant. With regard to the nature and circumstances of defendant's offense, the defendant committed a serious offense, selling firearms unlawfully to a known gang member who, based on the conversations between the CS and the defendant, intended to provide the firearm to other gang members to commit violence. Moreover, defendant compounded the severity of his original offenses when he obstructed justice in this matter. In particular, the defendant made false statements to the magistrate judge during the bond hearings in this matter, in which the defendant claimed to be suffering from cancer when, in truth and fact, his cancer has been in remission for several years. The magistrate judge specifically found that the defendant had lied:

> The other thing that's troubling to me and that undercuts the honesty issue is that you told pretrial services that you currently have cancer, that you're receiving chemotherapy every three months at Silver Cross Hospital. And you sat here during multiple hearings in this case while Mr. Rascia was trying to get the medical records that you have for that, and where the Court and counsel talked about the -- you know, your current health situation, which everybody was understanding was currently suffering from cancer and needing chemotherapy every three months.
>
> When the medical records were produced, they undercut that you -- the medical records show, and nobody disputes that now, that although you did have cancer, which is a serious medical condition, and it had spread, you underwent treatment for that in years past, and right now you're in remission. And the United States Marshal Service took you for a PET scan and a full body scan, and the doctors reported that you are free of cancer right now.

23

> *So the statement to pretrial services that you were*
> *undergoing treatment for cancer was not true.*

PSR, Government's Version of the Offense, Exhibit 6, at 16-17 (emphasis added).

Additionally, the defendant has a significant and violent criminal history, having been convicted of possession of a firearm, aggravated discharge of a firearm, conspiracy to commit murder, possession of contraband within custody, possession of 100-400 grams of cocaine with intent to deliver, and aggravated battery, in which the defendant struck a female-victim in public. *See* R. 173, at 10-12 (Government's Sentencing Memorandum).

Defendant's medical conditions cannot offset the severity and dangerousness of his criminal conduct. Defendant's medical records reflect that he is being treated by the BOP for his various conditions with multiple medications and regular physician evaluations. *See generally* Exhibit A. In addition, BOP records reflect that efforts to contain the spread of COVID-19 at FCI Pekin appear to be working. As of this writing on February 12, 2021, the facility reported 5 inmates and 8 staff members with confirmed active cases of COVID-19; just as significantly, 792 inmates and 71 staff members have recovered from the disease.[19]

In sum, given the seriousness of the defendant's criminal conduct and the severity of defendant's criminal history, early release of the defendant would not be warranted, even if had satisfied § 3582(c)(1)(A)(i)'s exhaustion requirement.

---

[19] *See* https://www.bop.gov/coronavirus/ (last visited Feb. 12, 2021).

## CONCLUSION

For the reasons set forth above, the government respectfully requests that this Court deny defendant's motion.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:     */s/Timothy J. Storino*
        Assistant United States Attorney
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois 60604
        (312) 353-5300

Date: February 12, 2021